### In re CHICAGO, R. I. & P. RY. CO.

### BLAINE et al. v. CHESTON et al.

### Nos. 6825, 6846, 6847.

Circuit Court of Appeals, Seventh Circuit.
Feb 16, 1940.

Root, Clark, Buckner & Ballantine, of New York City (Wilkie Bushby and John J. Verdon, both of New York City, of counsel), for appellee Protective Committee for Chicago, R. I. & P. Ry. Co.'s First and Refunding Mortgage 4% Bonds and Secured 4½% Bonds, Series A.

Edward K. Hanlon, of New York City, and Tracy W. Buckingham, of Chicago, Ill., for appellants James G. Blaine, Vincent Cullen, and James R. Trowbridge, as Bondholders' Protective Committee for First Mortgage 4½% Gold Bonds of Rock Island, A. & L. R. Co.

M. L. Bell, of New York City, and W. F. Peter and Otis F. Glenn, both of Chicago, Ill., for appellees Frank O. Lowden, James E. Gorman, and Joseph B. Fleming, trustees.

Alexander & Green, of New York City, and Winston, Strawn & Shaw, of Chicago, Ill. (Edward W. Bourne and Clyde W. Sorrell, both of New York City, of counsel), for appellee Protective Committee for Chicago, R. I. & P. Ry. Co. General Mortgage Bonds.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

This controversy arose in proceedings for the reorganization of the principal debtor under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The appellants constitute the Protective Committee for the holders of 14% of the Rock Island, Arkansas & Louisiana Railroad Company (hereafter referred to as Rial) First Mortgage 4½% Gold Bonds, due March 1, 1934. The appellants had filed a petition for general relief, which was referred to a master. The order appealed from overruled appellants' objections to the report of

the master which had recommended the denial of that petition.

The facts are complicated because there are several subsidiary corporations and many bond issues involved. The principal debtor filed its petition for reorganization on June 7, 1933, and it was approved on that date. Subsequently, petitions under section 77 were filed by five subsidiary corporations including Rial. The lines of all of these subsidiaries were operated by the principal debtor prior to June 7, 1933, under long term leases, and the stock of all was owned by it. Two other subsidiaries, all of whose stock was owned by the principal debtor and whose properties were operated by it prior to June 7, 1933, under leases terminable at will, also became subsidiary debtors. Two other subsidiaries, all of whose stock was owned by the principal debtor, also became subsidiary debtors. The properties of these last two companies, however, were not operated by the principal debtor under lease.

There are seven principal mortgage bond issues covering various parts of the principal debtor's system. Three of these cover properties owned by the principal debtor and the other four cover properties of three of the subsidiary lessors, including Rial.

On November 22, 1933, Lowden, Gorman and Fleming were appointed as temporary trustees of the estate of the principal debtor and also for all the subsidiary debtors. On December 28, 1933, this appointment was made permanent, and since their appointment they have operated all of the properties of the principal debtor's system, including the owned properties and the properties of the Rial and the other subsidiary lessors, as a unified system, as they were operated prior to the commencement of the reorganization proceedings. The trustees, however, have neither affirmed nor disaffirmed the Rial lease, nor the leases of any of the other subsidiary lessors. The time for making this determination was extended by the court until its further order, without objection from any of the parties. Prior to this time the protective committees of all the various bondholders had intervened.

Under the accounting classifications of the Interstate Commerce Commission, accounts of a railroad system operated as such are required to be kept only for the entire system, and reflect the results of its operations as a whole. Special operating revenue and expense accounts, as a rule, are not required to be maintained for the individual mortgaged or leased lines of a system. N. Y. N. H. and Hartford Railroad Company Reorganization, 224 I.C.C. 723. This method was pursued by the System prior to the institution of reorganization proceedings, and it was followed by the trustees after their appointment in the manner following. It was obvious that the revenues and expenses of the mortgaged and leased divisions of the System could not be ascertained except through the application to such unified operations of a formula designed to allocate the revenues and expenses to the respective divisions, as contemplated under section 77(c) (10) of the Bankruptcy Act. It was under this section that the District Court attempted in its sequestration order to establish separate accounts. By this order it directed the trustees to keep records and accounts showing separately the earnings of the respective divisions in accordance with a formula for the determination and allocation of the earnings of the respective divisions.

Pursuant to this order a formula for such purpose was proposed by the trustees, and applied to the operations of the System for the year ending May 31, 1934. This formula, however, was not approved by any of the parties or by the court. Its application for the year incurred a cost of approximately $84,000, and the trustees in November, 1934, petitioned the court for permission to discontinue it until further order, on the ground that there was no immediate necessity for its use. Neither the appellants nor any of the other parties made any objections to its discontinuance, and the order was granted.

No further steps were taken for the approval of a formula until the middle of 1937, when the Protective Committee for two of the bond issues of the debtor filed a petition in which they sought to adopt an earnings and expense formula. An order was had on this petition at which appellants were represented and offered no objection. As a result, the court entered an order which approved a specific and detailed formula for the allocation of the earnings and expenses of the respective divisions of the System, subject to certain terms and conditions. This is the only formula in effect in these proceedings and no motion was ever made by appellants to

modify it in any respect, unless appellants' present petition for general relief should be considered as such.

On July 19, 1937, appellants filed their petition for general relief in which they noted that the principal debtor had defaulted in the payment of rent to Rial since March 1, 1933, and that no interest had been paid on the bonds since that date, and that there was a default in payment on the principal on their maturity date of March 1, 1934. By this petition they sought relief from the practice of the trustees in bankruptcy of commingling the revenues and earnings of Rial with those of the principal debtor, and making expenditure for the operating expenses and for the benefit of and improvements upon the properties of the principal debtor, without regard to the rights of the Rial bondholders. They sought, among other things, to obtain directions requiring the trustees in bankruptcy to prepare and keep separate accounts, to segregate to the assets and properties of Rial from the assets and properties of the principal debtor, to pay $3,000,000 as rental of the Rial lines, to pay interest on the bonds of Rial, and otherwise to pay for its property which, they alleged, was being used for the benefit of others. In the alternative they asked for the removal of the trustees and the appointment of an independent trustee for Rial.

It is obvious that all of appellants' grievances were primarily based on the fact that the trustees had made no payments to the Rial bondholders either by way of rent, bond interest, or earnings. It may be said, however, that the trustees had made no payments to any of the other lessors or mortgagees of the System except for the payment, in the early part of these proceedings, of two semi-annual interest coupons on both the General Mortgage Bonds and the Choctaw and Memphis Bonds. In the first instance, the two interest payments were made on the debtor's bonds at the solicitation of all other committees. This was done because it was hoped that these 4% bonds, having a long maturity, could be kept out of default. The interest payments on the Choctaw Bonds were made pursuant to a court order on petition and on notice to all of the parties interested. The record discloses no objection to any of these payments.

■ The many issues tendered in appellants' petition have been narrowed to three here. They first contend that the District Court and the special master erred in preventing them from proving as a matter of fact that the Rial was earning the interest charges on its bonds. As proof of this fact they offered in evidence certain exhibits which they claim would have demonstrated that the Rial lines were amply able to service the bonds issued under its mortgage. These exhibits consisted of memoranda and calculations prepared by employees of the trustees of the principal debtor and related to the Rial mortgage lines and other lines adjacent thereto. They represented estimates with respect to the revenues and expenses, the contributed revenues and the credits for transportation of company materials of a section of the System comprised of the Rial and certain adjacent lines. These estimates were calculated on bases in many respects different from those set forth in the formula. No effort was made to produce as witnesses those who had prepared the estimates. The master refused admission as against the General Mortgage Committee and the First and Refunding Mortgage Committee on the ground that these two committees were entitled to have the witnesses produced, after appellants' counsel had declined to stipulate that he was not praying for any relief which would involve any charge against the property subject to the general mortgage, or any charge against any funds on which the general mortgage might have a claim. Under these circumstances there was no error in this ruling.

■ The court further based its ruling as to the rejection of these exhibits on the fact that none of them was prepared in accordance with the formula above referred to, stating that any determination of amounts payable to the Rial interests must be made in accordance with that formula, unless and until a motion to modify it should be made and granted. We do not understand that appellants contend that these exhibits were prepared in accordance with the formula, but rather they contend that the formula is both inadequate and inequitable and should not be applied to the determination of the amounts due to the Rial interests. In view of the fact that appellants offered no objections to the entry of the order approving the formula, and have never moved to modify it, we think that they are in no position to question its

adequacy or its equity, except by motion to amend the formula.

■ Appellants further offered to introduce certain exhibits, together with oral testimony with respect to transportation of company materials over the Rial, and adjacent lines which Rial did not own. In substance these exhibits consisted of various calculations as to the credits which would accrue to the Rial and certain adjacent lines for the transportation of company materials, based on certain assumed rates. The approved formula contains a specific provision with respect to the credit and charge to be made among the various divisions of the System for the transportation of company materials. It provides a rate of five mills per mile, whereas the proffered testimony was based on higher rates. For this reason the testimony was rejected, and we think quite properly. See Palmer v. Palmer, 2 Cir., 104 F.2d 161.

■■ Appellants contend, however, that the District Court misconstrued the order (summarized in the margin)[1] which approved the formula, and they claim that paragraphs 5 and 6 of the order constitute a sufficient basis for the relief here demanded. We think this contention is not tenable when those sections are construed with paragraphs 3 and 4. It is true that paragraph 5 recites certain facts, in addition to earnings and expenses, which may be taken into consideration in determining the relative values of the different divisions. The issues presented here, however, are not concerned with the relative values of the divisions of the System but with the net earnings of the Rial lines. Until the Rial lease is affirmed by the trustees of the principal debtor, they cannot be held to account to the Rial trustees or its bondholders for more than the net earnings of the Rial lines, and, if operations of the Rial lines result in net losses they will be chargeable against the Rial estate. Westinghouse E. & M. Co. v. Brooklyn Rapid Transit Co., 2 Cir., 6 F.2d 547, and cases cited; In re Chicago, Rock Island and Pacific Railway Company, 7 Cir., 90 F.2d 795. The relative values of the respective divisions of the System, as stated in paragraph 5, are relevant in the consideration of the plan of reorganization, and for such purposes it is proper to consider the subjects of contributed traffic, strategic position and prospective earnings, or any other relevant factors in determining such relative values. To accept appellants' construction of paragraphs 5 and 6 would obviously deprive the formula of its purpose and effect. Paragraph 6 should be construed in connection with paragraph 4, which plainly requires that a change of the formula can only be obtained in response to a motion for that purpose. Otherwise the formula adopted would mean nothing, for each subsidiary company might seek the same relief which Rial is now demanding, and the reorganization proceedings would be subject to utter confusion.

■ Appellants' further contend that the order adopting the formula 'directed the

---

[1] Order of June 17, 1937:

1. Approved the annexed formula, subject to the terms and conditions thereinafter contained;

2. Directed the trustees of the principal debtor to apply the formula to operations of the Rock Island lines for two years beginning January 1, 1936, and ending December 31, 1937, and to prepare certain supplemental information;

3. Reserved the right to any party to propose appropriate provisions on that subject and to move for an appropriate order for the modification of the formula;

4. Provided that the approval of the formula should be without prejudice to the right of any party including petitioners, to move to modify the same in any respect in which it should appear to be incomplete or to operate inequitably;

5. That nothing therein should be deemed to require that the results of the allocation of earnings and expenses therein provided for should be the sole factor to be considered in determining the relative values of the different mortgage divisions, or to exclude consideration of contributed traffic, strategic position, prospective earnings, or any other relevant factors in determining such relative values;

6. And that the Court reserved the right to make any other or further order with respect to the said formula, and the application thereof, as might seem just; and this order should not constitute, and should be without prejudice to, a final determination of the rights and liens of the respective mortgage trustees and other parties thereto in respect of any earnings and income and the credit for the transportation of company material.

trustees to apply the formula only for the two years beginning January 1, 1936, and that it had no reference to the prior years in which the trustees were operating the System. It will be noted that paragraph 1 specifically stated that the formula was approved, and nowhere in the order is its application limited to certain years. It is true that paragraph 2 provides the period for which the trustees were then directed to apply the formula. However, there is no reason to doubt that the court intended to apply it to all other years involved, if and when it became necessary. We find nothing to indicate that the court intended to have different formulas for different years. We think this contention is without merit.

█ We are of further opinion that appellants' petition for general relief cannot be considered as an application to modify the formula. It completely ignores it. During the hearing before the master, and since, no motion to modify the formula has been made, and this in face of the fact that the master ruled that the remedy for a modification of the formula was by a motion directly asking for such modification. It is obvious from this record that appellants concurred in that ruling, for after filing their petition for general relief they requested the trustees of the Rial to join them in an application to the court to modify the formula, which the trustees of Rial refused to do, and appellants then continued the prosecution of their present petition.

It is further contended by appellants that the master's ruling with respect to the excluded evidence ignored the order which directed the maintenance of records and accounts showing separately the earnings and profits of the various companies. This was the sequestration order, and it provides that such records and accounts should be kept in accordance with a formula, which so far as this record discloses may have been done, but the evidence which was excluded was not in accordance with the formula.

Aside from the evidence which was excluded, there is but one item of evidence touching upon the earnings of the Rial. This is a statement of the results of the application of the approved formula to operations of the System for the year 1936. It only relates to operations for that year and of course could not be accepted as proof of the results of any other year. Moreover, it is incomplete upon its face because it does not take into account capital expenditures on the Rial lines during that year, and it does not contain any charge against the Rial for its use of equipment and other property belonging to other mortgage divisions. Furthermore, the proper rate for such charge is the subject of appeals now before this court in several different cases arising out of this proceeding.

In view of these facts, it would not be possible to say with any degree of accurary that operations of the Rial line since the commencement of the reorganization proceedings have resulted in net earnings.

█ Appellants further contend that the impairment of the Rial mortgage and the taking and confiscation of income and earnings for the use of the property described constitute a taking of appellants' vested rights without due process of law or the payment of just compensation. Even if earnings were shown, that of itself would not amount to a violation of appellants' constitutional rights, as urged. The acts complained of involve nothing more than a suspension of appellants' remedies and do not amount to an impairment of their property rights. Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island Railway Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110. Appellants urge, however, that in the case just cited it was held that the injunction to delay the remedy might not be extended to permit long delay without adequate excuse. This is quite true, but there is no evidence in this record that there has been any undue delay in the reorganization proceedings. While the proceedings have consumed a great deal of time, yet from the tremendous amount of property involved, together with the number of parties engaged, and the many intricate questions involved, we cannot say without supporting evidence that there has been an undue delay. Section 77(g) of the Bankruptcy Act provides a procedure in case an issue of that character is desired to be raised, which is by a motion for the dismissal of the reorganization proceedings. No one has made such motion.

Furthermore, the record of the Interstate Commerce Commission discloses that a proposed plan of reorganization of the Rock Island System has been recommended and no doubt will be given an early hearing.

Under these circumstances we cannot say there has been undue delay in the suspension of appellants' remedies. Since the decision in the case of Continental Bank v. Rock Island Railway Co., supra, the Supreme Court has gone to great lengths in approving the extension of time for the consummation of plans for relief under the amended Bankruptcy Act. In Wright v. Union Central Insurance Co., 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490, it was held that the Bankruptcy court, after a debtor's default of many years standing, and after a foreclosure sale, was authorized to extend the period of redemption which had been fixed by a State statute. Under that ruling we cannot say that there was undue delay here, or that there was any impairment of appellants' vested property rights. The effect of that case cannot be avoided by saying that the cases cited to support the conclusion do not support it. That question has become academic and we are bound by the conclusion. Certainly the record here discloses no violation of any right of appellants which bears so close a resemblance to a fixed property right as that referred to in the Wright case.

It is next contended by appellants that the court erred in not requiring the trustees either to pay the rental reserved in the lease for the benefit of the bondholders, or to pay the surplus earnings of Rial to themselves as trustees of Rial, and thereupon to pay to the extent of such earnings the mortgage interest on the Rial bonds. Until the trustees of the principal debtor affirm the Rial lease, it is clear that they are not bound to pay the rental. From what we have said it is neither practicable nor possible, from the evidence introduced and/or offered, to say that there were surplus earnings of the Rial line.

■ It is further contended by appellants that there is such a conflict of interest here presented as to preclude the trustees of the principal debtor from fairly representing Rial, and that the District Court should have removed them and should have appointed another trustee or trustees for Rial. It is quite true that a case of this character always involves many conflicting interests. Similar conditions nearly always arise in equity receiverships. But that fact alone has seldom, if ever, been used as a reason for appointing more than one set of trustees. If appellants' contention in this respect were permitted with respect to all of the subsidiaries, it would be most difficult indeed to make any progress whatever in accomplishing the thing which Congress obviously intended.

Decree affirmed.