**In re CENTRAL OF GEORGIA RY. CO. (J. S. FARLEE & CO., Intervener).**

**No. 4829.**

District Court, S. D. Georgia,
Savannah Division.

Jan. 12, 1942.

Connerat, Hunter & Cubbedge, of Savannah, Ga., for Farlee & Co.

Adams, Douglas & Brennan, Anderson, Cann & Dunn, Henry Brennan and T. M. Cunningham, all of Savannah, Ga., Alexander & Green and Larkin, Rathbone & Perry, all of New York City, and Pitney, Hardin & Skinner, of Newark, N. J., for certain trustees and certain bondholders committees.

LOVETT, District Judge.

The question to be decided is whether the proceeds derived from the abandonment and sale of a part of a "mortgage division" of the debtor shall be distributed now to the bondholders secured by the divisional mortgage, or shall be retained by the trustee under the Mortgage Indenture, in whose custody the fund was placed subject to the control of the court, until the equities of the many parties at interest in this proceeding have been adjusted and a "fair and equitable" plan of reorganization of the railway company has been submitted to the court.

A history of the case, the facts considered and the reasons for my conclusions should be stated.

### History.

On December 19, 1932, on a bill in equity filed by an unsecured creditor a receiver was appointed by this court for the assets and property of the railway. In 1933 the mortgage trustee of the Oconee division filed its plenary suit for the appointment of a receiver of the property covered by its mortgage. Other mortgage trustees did likewise. An account of the properties subject to the various mortgage liens was asked to be taken, as well as a segregation of income to be made by the receiver. The original receiver named under the creditor's bill was appointed receiver for each division on which there was a separate mortgage. In effect, if not in words, the original receivership was extended to cover the receiverships for the divisions. Orders impounding income pledged under the several mortgages were entered early in January, 1934, but payment of such income to the mortgage trustees was to be made at such times as provided by the further orders of the court. The causes were then consolidated in equity and continued as one case until 1940 when the debtor filed a petition in this cause for reorganization under Section 77 of the Bankruptcy Act, 11 U. S.C.A. § 205. Trustees were named by the court, their appointment ratified by the Interstate Commerce Commission, they qualified, and the proceedings in equity thereupon for practical purposes were terminated. While the receiver in equity was administer-

ing the property in 1938, on his application, and after appropriate authority from the court and the Interstate Commerce Commission, more than one half of the Oconee division line of railroad was abandoned and the tracks were taken up and sold free and clear of liens, valid liens being transferred to the proceeds of the sale. The order of the court provided that the proceeds of the sale should be deposited with the mortgage trustee "pending the further order of the court and the disposition of any claims or liens upon the same." The trust company which was the mortgage trustee in 1938 has now resigned, its successor has been appointed, and the fund is with the successor trustee.

J. S. Farlee & Company, holding one third or more of the total outstanding bonds of the division, in their own behalf and on behalf of other bondholders similarly situated, intervened and became a party in these proceedings about a year ago; and they pray that the proceeds of the sale of the abandoned line now be distributed by the mortgage trustee to the bondholders in whose behalf a first lien on the whole division was created, asserting there are no valid claims or liens against the fund except their own. Mortgage trustees under other mortgages securing other bonds of the debtor and one bondholders' protective committee oppose the distribution of the fund at this time, and say that an accounting is necessary—and can not now be made—to determine the equitable status of the fund, and that a present disbursement of the fund, going, as it would, beyond the court's power to control, would be premature; that the whole fund should be retained until a plan of reorganization of the railway is prepared and submitted to the court. No plan is now before the court, although certain preliminary steps necessary for the preparation of a plan are now being taken, e. g., the formulating and adoption of a method for segregation and allocation of the earnings and expenses among divisions, leased lines, etc., in accordance with Section 77, sub. c(10), of the Act. The formula is now before the Interstate Commerce Commission for recommendations to the court.

A hearing was had on this intervention in March, 1940, before the late Judge BARRETT. He had rendered no decision when he died. The issues are to be determined by me on the pleadings, transcript of evidence, certain stipulations, facts which may be judicially noticed because a part of the proceedings in this court, and briefs of counsel.

## Facts.

The Oconee division is a short or branch line in the railway system. In 1932, when a receiver was first named for the properties, it was 77.01 miles in length. (The total owned and leased lines of the system operated by the trustees then and now were about two thousand miles.) The properties comprising the division are subject to a first lien under a divisional mortgage securing bonds issued by the debtor. After the abandonment of the portion of the division already mentioned, 47.40 miles, and only recently, another application has been made to the Interstate Commerce Commission to take up and dispose of 19.49 miles more of the line. If granted, there will remain only 10.12 miles of the original division. It touches the main line at Dover about 57 miles from Savannah, Georgia, a terminus, and now extends through Statesboro to Metter, a town of some two thousand population, without other railroad facilities. It has no connections other than the one with debtor's main line with which it interchanges traffic. The pending application for further abandonment relates to the segment lying between Statesboro and Metter. The original line, and the remnant now left, extend through an agricultural section of Georgia in which there are no large industries producing tonnage for a railroad. The facts stated are not in dispute.

Since 1932 the Oconee division has never paid its way. Not only has the operation of the line failed to earn the interest on its outstanding bonds, but has resulted in large losses, the amount of which, for lack of a judicially approved formula for segregation of earnings and expenses of the several divisions, has never been mathematically ascertained. The only figures before the court come from the accounting department of the bankruptcy trustee, and, while, for the reasons stated, they are estimates only —and are, therefore, objected to by the intervener—they show for the years 1934 to 1939, inclusive, the operating losses for the division exceed the total principal amount of the outstanding bonds by one hundred thousand dollars. If the losses for the entire period of the receivership and bankruptcy were computed in the same way the amount would be more. This court judicially knows that if the entire division should be abandoned, the salvage value, together with the funds in hand and in controversy, would be far less than the amount of bonds which the line secures. There is, therefore, no equity available to other creditors, secured

or unsecured, unless it be that the operating losses mentioned are an asset to be recovered and administered for their benefit, which means, of course, displacing the contract lien of the bondholders by reason of Section 77 or on some other equitable theory. It is also clear, I think, that the retention in the system of the reorganized railway, when the time comes, of the small remnant of the Oconee division that may then be in operation is not essential to a sound plan of reorganization.[1] At this time, however, the parties should not be foreclosed from considering under a plan of reorganization the proper place into which this balance of the line should fall.

### Conclusions.

This is not a case where the sale or disposition of collateral held by a creditor as security will hinder, obstruct, delay or prevent the preparation and consummation of a plan of reorganization. I would have no hesitancy in holding in a case of that kind that the court has power to require the fund in controversy to be held intact until due consideration could be given under a plan of reorganization as to what should be finally done with it, and should exercise it. Continental Illinois Nat. Bank, etc., v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 649, 675, 678, 55 S.Ct. 595, 79 L.Ed. 1110; In re Chicago R. I. & P. R. Co., 7 Cir., 110 F.2d 395, 400. Whether the fund is now or later disbursed to bondholders of the division, or in a plan of reorganization is exchanged for new securities, in view of the amount involved, is of minor consequence in working out a plan. Nor is it a case where the court at this time would be required to stop and try out involved issues as to the earnings or losses of a particular division, or of the several divisions. If it were a case of that character the application for disbursement might be premature. See In re Chicago R. I. & P. R. Co., 7 Cir., 90 F.2d 795; In re Chicago & N. W. R. Co., 7 Cir., 114 F.2d 963. When a plan of reorganization is presented, should it turn out on a true accounting that the debits properly chargeable to this division represented by income of other divisions diverted in receivership or in bankruptcy are so great and of such a nature as to equitably require the setting up of a lien prior to that of the first mortgage on the division, the balance of the physical property not yet abandoned or sold (or the proceeds from sale if hereafter abandoned) will be available and, I think, adequate for the purpose.

If the contract lien of the bondholders or the money substituted for the physical properties which were subject to their mortgage is to be displaced, it must be either because of some requirement of Section 77 or upon some equitable consideration so demanding. Ordinarily in a bankruptcy case a mortgage creditor is entitled as of right to the proceeds of the sale of mortgaged property producing less than the secured debt, and that without even formal proof of claim. In re Winner-Franck Baking Co., D.C., 58 F.2d 409; affirmed Schug v. Caldwell, 3 Cir., 61 F.2d 1039, certiorari denied 288 U.S. 609, 53 S. Ct. 401, 77 L.Ed. 983. It is not unusual in bankruptcy proceedings for mortgaged property to be abandoned by the trustee to the bankrupt or secured creditor where there is no equity available for other creditors, and to allow the creditor to pursue his remedies in the state court or otherwise as he may deem best. Union Electric Co. v. Hubbard, 4 Cir., 242 F. 248, 250; Hoehn v. McIntosh, 6 Cir., 110 F.2d 199(4), 201, 202. The fund here being considered was produced and placed with the mortgage trustee before the proceedings in bankruptcy were instituted. It may be doubted, therefore, whether any of the provisions of Section 77 apply. But treating them as applicable I find nothing in the statute requiring the displacement of the lien or subordinating it to any general operating deficit. On the contrary, some of the provisions of the Act seem to suggest that it was the legislative purpose to grant the court broad discretion in the disposition of funds derived from the sale of an abandoned line subject to a divisional mortgage. Sub-paragraph o, 11 U.S.C. 205 sub. o, 11 U.S.C.A. § 205, sub. o, requires the bankruptcy trustee from time to time to determine what lines or portions of lines of railroad, if any, should be abandoned or sold during the pendency of the proceedings in the interest of debtors of the estate and of ultimate reorganization, without unduly or adversely affecting the public interest, and directs him to present to the judge petitions for authority to abandon or to sell any such property; and "upon order of the judge * * * the trustee * * * shall take all steps and carry out all proceedings necessary for the consummation of

---

[1] The total amount of the Oconee division bonds (principal) is $462,000; for the system as a whole $53,516,915.50.

944

any such abandonment or sale in accordance with the order of the judge". The judge "may order and decree any sale of property * * * subject to or free from liens [and] may order the trustee or trustees of the debtor to deposit such proceeds with any mortgage trustee entitled thereto, to *be applied in payment of all or part of such mortgage."* (emphasis mine). It is true sub-paragraph (b) of the Act permits a plan of reorganization within the meaning of the section to include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise, and also allows the retention of all or any part of the property by the debtor, the sale of all or any part of property of the debtor either subject to or free from any lien at not less than a fair upset price, the distribution of all or any assets, or the proceeds derived from the sale thereof, *among those having any interest therein,* the satisfaction or modification of any liens, indentures, or other similar interests, and the issuance of securities of either the debtor or a reorganized corporation in exchange for existing securities, or in satisfaction of claims or rights or for other appropriate purposes. By these provisions Congress was legislating with reference to an ultimate reorganization plan, and was far from saying that any operating deficit of a mortgaged division, made good through earnings of other profitable mortgaged divisions where the system was operated by the bankruptcy trustees as a whole, should be entitled as of right to priority in payment over the claims of the bondholders of the unprofitable division. If Congress had intended that operating deficits of this general nature should displace the contract lien of bondholders under all circumstances, it would have been easy to say so. See amendment approved August 11, 1939 to par. n of Sec. 77, by which claims for amounts paid by sureties on bonds and for personal injuries to employees, etc., were given priority. 53 Stat. 1406, 11 U.S.C.A. § 205, sub. n; Powell v. Link, 4 Cir., 114 F.2d 550. A vested property right such as that acquired under a mortgage indenture conveying physical property like a railroad should not be lightly set aside through implications only in the Act. If that should be the policy required under Section 77, it is easy to foresee that divisional bondholders immediately upon the filing of proceedings like these will be placed in a most precarious situation. If operations for a trial or test period to determine whether the railway system as a whole may be reorganized result in operating losses of a particular division, and the loss is large enough, the bondholder may lose all of his security. There will be a great temptation, at least, for all divisional bondholders to ask immediately either that operations cease on their divisions, or that they be abandoned and sold. If granted, dismemberment of the property would follow at once, and the very purposes of the reorganization Act of Congress would be defeated. By permitting a plan of reorganization to include provisions modifying or altering the rights of creditors and the issuance of new securities of the reorganized railway in exchange for existing securities, or in satisfaction of claims which included liens, in my view Congress had in mind those liens on physical property necessary to be taken over in reorganization as a part of an entire railway system and without which a fair, equitable and feasible plan of reorganization could not be formulated, but did not have in contemplation money received through the abandonment and sale as scrap material of a small branch line. An abandoned line can be no physical part of the reorganized system. Nor can its money substitute.

█ One who furnishes money to a railroad to be applied for the purpose of operating its properties usually stands as an unsecured creditor without a lien upon the corpus, even though the money so furnished may have been used in the purchase of material or supplies that were necessary to the operation of the road. Morgan's Louisiana & T. R. & S. S. Company v. Texas Central R. Co., 137 U.S. 171, 172, 194–199, 11 S. Ct. 61, 34 L.Ed. 625; Union Trust Co. v. Illinois Midland R. Co., 117 U.S. 434, 479, 6 S.Ct. 809, 29 L.Ed. 963; Southern Development Co. v. Farmers' Loan & Trust Co., 5 Cir., 79 F. 202, 212, and cases cited.[2]

---

[2] See, also, Gregg v. Metropolitan Trust Company, 197 U.S. 183(1), 25 S.Ct. 415, 49 L.Ed. 717; United States v. Guaranty Trust Co., 8 Cir., 33 F.2d 533; United States Fidelity & Guaranty Co. v. United States & Mexican Trust Co., 8 Cir., 234 F. 238(2), L.R.A.1916F, 1067; Mercantile Trust Co. v. Tennessee Central R. Co., D.C., 291 F. 462, 471, 472; Fordyce v. Omaha, etc., R. R., C.C., 145 F. 544, 554, 555; and Martin Metal Mfg. Co. v. United States & Mexican Trust Co., 8 Cir., 225 F. 961, as to the necessity for diversion of income.

To be entitled to priority ahead of lien-holders such a creditor surely would have to show with some degree of certainty what portion of the monies advanced by him went for the necessary material, supplies, labor, etc., and could not claim a general preference for all advances. Chicago & A. R. Co. v. United States & Mexican Trust Co., 8 Cir., 225 F. 940(6). No proof of this nature has been offered in the case now under consideration.

■ It has been suggested that in order to give mortgagees the protection to which they are legally entitled it is necessary to treat the properties comprised in the various separate mortgage divisions as separately owned for the purpose of determining earnings and expenses while the system is being operated in bankruptcy. In re Chicago, R. I. & P. R. Co., 7 Cir., 108 F.2d 410, 413. This is quite true. This does not mean, however, that the properties are to be considered as separately owned for all purposes, or that when earnings and expenses have been determined losses shall displace contract liens without regard to what brought about the losses. A segregation formula alone may not give the whole picture. Many relevant factors to be taken into account in the allocation of new securities under a plan of reorganization are not revealed by such a formula, i. e., the value of contributive traffic, severance values, strategic position, etc. In considerable measure management may control through the routing of traffic for the benefit of the system as a whole the losses or earnings of divisions, and it might be quite inequitable to make a particular division suffer unduly because it handled less traffic while operated as part of the entire system than it might have been able to obtain if separately managed and operated.

■ It is also suggested that a mortgaged divisional line stands in no better position with respect to operating deficits than a leased line; and that where a lease has neither been adopted nor rejected by the bankruptcy trustees, and the property is operated by them under paragraph c (6) of the Act "for the account of the lessor" the bankruptcy trustees have a claim for such losses prior to the lien of the lessor's bondholders. Palmer v. Palmer, 2 Cir., 104 F.2d 161, 165, certiorari denied 308 U.S. 590, 60 S.Ct. 120, 121, 84 L.Ed. 494, and Palmer v. Warren, 2 Cir., 108 F.2d 164, affirmed 310 U.S. 132, 60 S.Ct. 865, 84 L. Ed. 1118, are cited to support this view. I can not agree that the analogy is complete. By the express terms of Section 77 the bankruptcy trustees operate a leased line under the circumstances stated *for the account of the lessor* until the abandonment of such line is authorized by the Interstate Commerce Commission. As to a branch line, subject to divisional mortgage, the operation is not necessarily or primarily for the account of the bondholders secured by the properties comprising that line. It seems to me the operation is more for the account of whom it may concern, in the nature of experiment or test to determine if the whole system can be put into one reorganized railway, or if some portion of it (as here) must be abandoned and the tracks taken up and sold. Theoretically, in the case of a leased line, upon the rejection of the lease by the trustees, the lessor may take his property back and operate it himself, or, as often happens, if he finds himself unable to do so immediately for lack of equipment or for other reasons, under the act it becomes the duty of the lessor at the end of a period to be fixed by the judge to begin the operation of such leased line, unless the judge shall decree that it would be impracticable and contrary to the public interest so to do, in which event it shall be the duty of the lessee (or its bankruptcy trustees) to continue operation, and so long as operated by the bankruptcy trustees of the lessee the operation is "for the account of the lessor". While operating a leased line for the account of the lessor bankruptcy trustees can not be held to account for more than the net earnings of the line; if operations result in net losses, they will be chargeable against the lessor's estate. In re Chicago R. I. & P. R. Co., 7 Cir., 110 F. 2d 395, 399. In the case of a mortgaged division net income above the interest on the bonds does not necessarily belong to the bondholders—certainly not until such income has been impounded for their benefit by an appropriate order of court or equivalent action taken. Southern R. Co. v. Carnegie Steel Co., 176 U.S. 257, 275, 20 S.Ct. 347, 44 L.Ed. 458. Even if impounded, it is unlikely that such excess would be paid over to bondholders pending reorganization; more likely it would be retained or used and taken into account in the issuance of new securities when a plan of reorganization was brought forward. That is what happened here while the case was in equity. Even as to leased lines, however,

all operating deficits are not given priority over the claims of bondholders. In Palmer v. Warren, supra, the Boston & Providence R. R. Corporation—a leased line in the New Haven system—had no mortgage. See 108 F.2d 165. The court merely liquidated the amount of the deficit and charged it as a lien prior to general creditors. In Palmer v. Palmer, supra, another New Haven case, Circuit Judge L. Hand had before him somewhat different facts. He was considering heavy operating deficits of the Old Colony Railroad, a leased line of the New Haven system. In the original order which approved the new Haven's petition for reorganization, entered October 23, 1935, the District Judge directed the trustees to pay "such sums as may be necessary to comply with the obligations of the debtor under contracts or leases". On June 1, 1936, the bankruptcy trustees rejected the lease. By virtue of the original order, however, they had paid the stipulated rent due under the lease while they were considering whether to adopt the term. The bankruptcy trustees insisted that the rental so paid, and the deficit incurred since October 23, 1935, should be debited against Old Colony and that both items rank ahead of its bondholders. On November 30, 1935, after only one installment of rent had been paid, the judge passed a second order that, in case any leases were eventually rejected the "payments shall be deemed to have been for the account of the lessors, and such payments shall be recovered, set-off, or made a charge on the earnings and/or properties of the lessors prior to any mortgage or other lien thereon". This second order was served upon the president and attorney of the Old Colony, and subsequently the Old Colony accepted payments without reservation with knowledge of the order, and thereafter disputed that there were either debits against it in the account, or, if debits at all, that they were prior to the lien of its bondholders. Notwithstanding the order of the district court of October 23, 1935, it was held that the rentals paid should not be put ahead of the bondholders' lien. The disbursements for operating expenses, or at least some of them, were treated differently. Payments which made up the deficit were by hypothesis necessary to run the road and therefore to the continued existence of the Old Colony franchise—a valuable thing to a leased railroad. The trustees were held to be entitled to be subrogated to the claims of those who supplied the goods or furnished the services making up

the deficit, and that right included whatever security claimants would have had. The six months rule in equity (Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339) was not applied rigorously. The Old Colony itself had filed a petition for reorganization in bankruptcy on June 3, 1936. The court was unwilling to limit the right of subrogation to payments made within six months before that date. The extent of the ruling was that for all disbursements making up the deficit the bankruptcy trustees had a claim prior to the lien of the bondholders to the extent that the claims paid would have been prior to that lien if they had been incurred within six months of the petition filed.

In the Chicago & N. W. Ry. Co. case, 35 F.Supp 230, 254, District Judge Barnes held that funds derived from the sale of a portion of a subsidiary line under separate mortgage should not be disbursed to bondholders pending reorganization, and his holding may be regarded as a physical precedent persuasive in this case. Again, however, the facts were quite different. There a plan of reorganization was before the court. A portion of the line covered by the mortgage had been sold free and clear of the lien, the lien being transferred to the proceeds. Pursuant to the order some few thousand dollars had come into the hands of the bankruptcy trustee. The plan as formulated and certified provided for the delivery to the holder of each $1,000 principal amount of the first mortgage bonds 11.80 shares of common stock in the new company. Due consideration had been given, doubtless, to the money in the hands of the bankruptcy trustee in the allocation of that stock. If the money had been ordered disbursed to the bondholders, the plan which had already been certified by the Interstate Commerce Commission would have had to be amended. Under such circumstances, the court in the exercise of a sound discretion found that the money should not be so disbursed. The facts, therefore, are quite unlike those existing in the present case.

In the Denver R. G. & W. R. Co. reorganization the Interstate Commerce Commission, in determining whether or not the plan was fair and equitable, afforded due recognition to the rights of each class of creditors and stockholders, did not discriminate unfairly in favor of any class, conformed to the law of the land regarding the participation of the various classes of

creditors and stockholders and was compatible with the public interest, as required by the provisions of Section 77(d) and (e), reviewed the financial result of operating certain branch lines subject to the first lien of a mortgage. The operating loss from these lines, as calculated by the debtor and a committee representing an intervener, was approximately $40,000 during a certain test period. On account of such ascertainment of loss the amount of new securities of given classes issuable to the holders of the mortgage bonds of the branch lines was reduced about $870,000 by the debtor and about $1,000,000 by the committee. As opposed to the losses thus calculated, according to the mortgage trustee the system revenue contributed by these branches yielded approximately one million dollars of net revenue. The mortgage trustee undertook to show that by giving the branches a 15% division of the revenues and by adjusting operating expenses and taxes, the net earnings of the branches would be about $100,000.00. The data used to obtain the results claimed admittedly were incomplete and the methods followed were shown to be questionable by counsel for the committee. The Commission held that the alleged earnings from the branches could not be considered as a standard, but, on the other hand, in view of the large amount of system revenue derived from the traffic originating or terminating at stations on the branches, the propriety of charging them with a substantial loss might be doubted, and then added: "We consider it fair under the circumstances to disregard the alleged loss on the branches in dealing with * * * mortgage bonds". The facts as disclosed in the Denver, R. G. & W. R. Co. case seem to me to more nearly approach the facts of the present case than any with which I am familiar or to which my attention has been called. See Denver & R. G. W. R. Co. Reorganization, 233 I. C.C. 515, 516, 572.

■ On the present state of the record I can not declare that the operating deficits, wholly unexplained as to their nature and character, but which I assume at this time were brought about chiefly if not entirely in the operation of the Oconee division in a normal manner, absent great outlays for additions, betterments, etc., should be put ahead of the lien of the bondholders on the properties comprising that division. I am fortified in this view by the fact that the bondholders of unprofitable divisions until recently were not put on notice that operating losses would result in so great impairment of their security. If the profitable divisions, when orders for impounding income were entered, had indicated they would claim a diversion created a priority, they would stand in better position. Holders of bonds of divisions that had income to be impounded can not escape some obligation either to object to diversion or to put others on notice priority would be claimed against those to whom the diversion was made.

■ This ruling does not mean that the bondholders shall not hereafter, or even now, make some contribution to the expenses incurred in the preservation of the properties which they hold as security, and for outlays from diverted income that may have enhanced the value of their security, if it hereafter appears there was an enhancement. Upon principles of general application, courts having custody of property or a fund have the power to require that expenses which have contributed either to the preservation or creation of the fund in its custody shall be paid before a general disposition among those entitled to receive it. New York Dock Co. v. The Poznan, 274 U.S. 117, 120, 121, 47 S.Ct. 482, 71 L.Ed. 955; Warren v. Palmer, 310 U.S. 132, 139, 60 S.Ct. 865, 84 L.Ed. 1118. A court of bankruptcy should apply these general equitable principles.

■ The fund in hand originally was $80,000. It has been reduced by $1,744.32 through allowances heretofore made by the court to the mortgage trustee and its counsel. The response filed by the bankruptcy trustees to the Farlee intervention discloses that the abandoned line was subject to unpaid taxes aggregating $15,549.40, besides interest, for the years 1937 and 1938. That amount should be reserved for future disposition. Some additional reservation should be made from the fund and hereafter used to pay the proper administration expenses incurred in equity and in bankruptcy, in the conservation and preservation of the properties which have been abandoned and sold. If an additional sum approximating $12,500 is so reserved, taking into consideration the value of the remaining portions of the division still in operation, the rights of the parties should be adequately safeguarded.

I therefore reach the conclusion that $50,000 of the funds in controversy now safely may and should be distributed by the

mortgage trustee ratably to all of the holders of the bonds secured by the Oconee division properties.

The intervener has prayed that an allowance be made for the actual and reasonable expenses for counsel fees and for disbursements incurred in connection with these proceedings. Under paragraph (c) 12 of Section 77 it may be necessary for the Interstate Commerce Commission to fix the maximum limits for such allowances, and, as the allowance may come out of the funds disbursed, a decree will, therefore, be withheld until this question has been determined.