## In re CENTRAL OF GEORGIA RY. CO.

### No. 4829.

District Court, S. D. Georgia,
Savannah Division.

Oct. 28, 1944.

T. M. Cunningham and George O'Donnell, both of Savannah, Ga., for Merrel P. Callaway, trustee of debtor.

Adams, Douglas & Brennan, of Savannah, Ga., for Citizens & Southern Nat. Bank, trustee of Oconee Division Mortgage.

Debevoise, Stevenson, Plimpton & Page, of New York City, and Hitch, Morris & Harrison, of Savannah, Ga., for trustee of First Mortgage.

Alexander & Green and Edward W. Bourne, all of New York City, and Mc-Laws, Brennan & Zeigler, of Savannah, Ga., for trustee of Consolidated Mortgage.

LOVETT, District Judge.

The question now to be decided is the one reserved in the opinion of this court of January 12, 1942, Document No. 151, viz., What contribution, if any, shall be made by the bondholders of the Oconee Division of the debtor railway for taxes paid and outlays made in the conservation and preservation by debtor's trustee of that portion of the Oconee line which has been abandoned and sold, the proceeds still being under the control of this court. See In re Central of Georgia Ry. Co. (Farlee & Co., Intervenors), D.C., 42 F. Supp. 940, 947 (9, 10).

There have been many developments looking to the reorganization of the debtor since the hearing in January 1942. The debtor and its creditors presenting no plan of reorganization, by direction of the court debtor's trustee has prepared and filed a plan. Hearings have been held by the Interstate Commerce Commission, and the plan is being considered by that body at this time. An effort to abandon more mileage of this division has been withdrawn. A formula for segregation and allocation of earnings and expenses of the divisions subject to the different mortgages was referred to the Interstate Commerce Commission and as recommended has been approved by this court. The plan of reorganization as now written allocates to the Oconee bondholders new common and preferred stock of the aggregate par value of $180,000 ($135,000 preferred, $45,000 common). Debtor's trustee now seeks authority to withdraw his claim against the fund for 1937 and 1938 ad valorem taxes of the abandoned line unpaid in 1942 but now paid by him, saying he informed the I.C.C. on the hearing on the plan he would ask for such authority, being advised the claim is of doubtful validity. He joins the Mortgage Trustee of the Oconee divisional bonds in an application to disburse to the bondholders the balance of the fund arising from the sale of the abandoned line.

The Oconee division is a deficit line. Under the segregation formula the losses from operations from May 1, 1934 to June 30, 1943 were $616,303. The traffic contributed to the system for the same period

was $732,074. If it be assumed that the cost of handling this contributed traffic was 50%, the net loss would exceed $250,000. The lines covered by the First Mortgage and by the Consolidated Mortgage of the debtor have had large earnings during this period. Their Mortgage Trustees have appeared and object to the disbursement of the balance of the proceeds of the sale of the abandoned line of approximately $28,-000, and urge that it be turned over to debtor's trustee to reimburse him for the taxes and operating losses of the Division, and that it become a part of the trust estate to be administered as other assets.

The Mortgage Trustees who object to the fund being disbursed have little financial interest in it. As to them the doctrine of de minimis perhaps might be invoked. They represent bond issues of $7,000,000 and $18,500,000 respectively. Where this $28,000 goes affects them very little. Some of the arguments advanced before me on this hearing in my opinion are more properly for the consideration of the Interstate Commerce Commission initially in determining the plan of reorganization that shall have its approval, and particularly as to the allocation of new securities to deficit lines.

It was held in this case in January 1942 that Congress in enacting Sec. 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, did not intend that any operating loss of a mortgaged division, made good through earnings of other profitable mortgaged divisions where the system was operated by the debtor's trustee as a whole, was entitled as of right to have priority in payment (through reimbursement of the trustee) over the claims of the bondholders of the unprofitable division. 42 F.Supp., at page 944. Therefore, if the proceeds of sale of the abandoned line are to be returned to the railway's trustee, it must be based on some equitable consideration, such as subrogation, conservation or the like. It must not be overlooked that the operation of a deficit line for a temporary period is not for the benefit of that line and its bondholders only; it is for the benefit of the system and to aid in determining a proper basis for reorganization. And an abandonment of an unprofitable line is for the benefit of all creditors; it stops the operating losses in whole or pro tanto as here.

If we look at the rights of the parties in this fund in a detached way, considering only the source of the fund, the large operating losses, taxes paid, diversion of earnings of non-deficit lines, and by cold analysis and rigid rules of logic attempt to fix the equities, much can be written in favor of returning the fund to the debtor's trustee. But I am unable to look at the matter that way. That is only a partial view of the larger picture, i.e., the treatment being accorded to other deficit lines in the plan of reorganization, the failure to burden them expressly with taxes paid on their lines, the inability of the debtor's trustee or any one else to trace any particular revenue into the Oconee line's losses, the lack of any reliable figures as to an appropriate charge for conserving this abandoned line for the several years it was operated by the debtor's trustee as a part of the Oconee division, and the fact that when this railroad is reorganized (if the treatment in the plan of this division is followed) the new securities the Oconee Division bondholders will receive probably will be less in value than the salvage they would presently receive if the remainder were abandoned and now sold for its salvage value. In balancing the equities between these bondholders I am unable to put these larger considerations entirely out of mind. I can see no good reason why because 1937 and 1938 taxes were unpaid at the moment in 1942 they become any greater charge on this line than taxes for other years that then had been paid by debtor's trustee; nor why taxes against this line should be treated differently from taxes on other deficit lines. It does not appear that debtor's trustee has made any improvements to the abandoned line which enhanced its value or added to the price received when it was sold. Operating losses for the whole of the division are not necessarily the equivalent of the cost of conserving the whole line, much less the portion abandoned. Operation of a line of railroad, if it is properly maintained, may conserve it; if maintenance is unduly deferred, it may depreciate its value.

If the fund is now disbursed to bondholders they will receive in cash $60 per bond, which, when added to the previous disbursement, will give them $155.70 per bond in cash. This is all they will get except new preferred and common stock in reorganization. They are, therefore, taking a very large loss from the par value of the

bonds they now hold. So also as to other bondholders, an inevitable consequence when the value of the security is less than par of the bonds. But to saddle these Oconee bondholders with another loss, one that bondholders of other deficit lines do not bear, under the circumstances here shown seems inequitable to me.

When the portion of the line from Metter to Brewton had been abandoned, H. D. Pollard, receiver of the Central, offered in the latter part of 1938 to pay to Guaranty Trust Company, then trustee of the Oconee Division Mortgage, $80,000 for the salvage of the abandoned line. This proposition was accepted by the trustee of the Mortgage. Nothing was then said about taking toll for taxes. It was not until some time later, in February 1939, the receiver for the first time claimed that there were unpaid taxes on the abandoned portion of the line, which for 1937 amounted to $2,498.72, besides interest, and for 1938 to $13,050.68, besides interest; and that these taxes should be charged against the proceeds of the salvage. The trustee of the Mortgage demurred to this claim, and the receiver paid the $80,000 to the trustee of the Mortgage under an order of court reserving the matter of tax liability for future determination by the Court. If the claim for taxes had been seasonably asserted—when the sale to the receiver was made—conceivably the sale would not have been consummated.

At the hearing there was some discussion as to whether the proposed allocation to the Oconee Bonds of $135,000 Preferred Stock and $45,000 Common Stock, total $180,000 of stock, was fair. The trustee of the debtor made the allotment on the following basis. The total mileage of the Oconee Division was 77 miles; 47 miles were abandoned, which is about 61% of the whole. The trustee of the debtor in making the allocation assumed that the Oconee Division bondholders would receive the proceeds of the abandoned portion, and that, therefore 61% of the Mortgage debt should be eliminated. 61% of the Mortgage debt of $462,000 is $281,820, which leaves a balance of the Mortgage debt to be provided for in the reorganization, $180,180. The trustee of the Oconee Division Mortgage contended that if the net proceeds, amounting to $71,933.40 of the abandoned property, were paid over to the bondholders, and if this amount was credited on the $462,000, the balance due would be $390,066.60, and that the Oconee Bondholders should be allotted securities in the reorganization on the basis of the balance of the debt of $390,066.60, and that if this course is pursued, then the Oconee Bondholders would be treated in the same manner as the other deficit lines were treated in the reorganization. I think that the question of what securities should equitably be allotted to the Oconee Division Bondholders is a question primarily for the decision of the Interstate Commerce Commission and, therefore, I do not pass on this question. The question of the distribution of the $28,000 which is now in the hands of the trustee, being the balance of the proceeds of the abandoned portion of the line, will not appreciably affect the reorganization, and the decision of this question will not trespass on the functions of the Commission. I regard this question as purely a legal question which the Court must decide.

The prayers of the petition will be granted.