UNITED STATES v. GUARANTY TRUST COMPANY OF NEW YORK et al.

Circuit Court of Appeals, Eighth Circuit. May 15, 1929.

No. 8389.

Elmer B. Collins, Sp. Asst. Atty. Gen. (William J. Donovan, Asst. Atty. Gen., on the brief), for the United States.

Warren S. Carter, of St. Paul, Minn., Henry C. Carlson, of Minneapolis, Minn., Charles Bunn, of St. Paul, Minn., and Jesse E. Waid, of New York City (Davis, Polk, Wardwell, Gardiner & Reed, of New York City, Davis, Severance & Morgan, of St. Paul, Minn., Edwin S. S. Sunderland, of New York City, Warren S. Carter, of St. Paul, Minn., Larkin, Rathbone & Perry, of New York City, Frederick G. Ingersoll, of St. Paul, Minn., Henry V. Poor and James L. Banks, Jr., both of New York City, Charles S. Kelly, of Minneapolis, Minn., White & Case, of New York City, Kingman, Cross, Morley & Cant, Norton M. Cross, and Kenneth Taylor, all of Minneapolis, Minn., Alexander & Green, of New York City, Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., James H. McIntosh and Geller, Rolston & Blanc, all of New York City, Boyeson, Otis, Brill & Faricy, of St. Paul, Minn., Edward H. Blanc, of New York City, and James C. Otis, of St. Paul, Minn., on the brief for mortgagees, and Fowler, Carlson, Furber & Johnson, of Minneapolis, Minn., on the brief for priority creditors), for appellees.

Before VAN VALKENBURGH and COTTERAL, Circuit Judges, and SCOTT, District Judge.

VAN VALKENBURGH, Circuit Judge. The Minneapolis & St. Louis Railroad Company is in the hands of a receiver appointed

in the District Court for the District of Minnesota, July 26, 1923, upon the application of certain creditors.

Subsequently actions were instituted for the foreclosure of mortgages, and these actions were consolidated with the suit instituted by the creditors' bill. These mortgages were made at various dates between 1888 and 1912, and are conceded to be valid and subsisting record liens upon the properties of the railroad mortgagor. During the progress of the receivership, not yet closed, it has been developed that there are numerous preferred creditors; that is to say, those whose claims arose as a current expense of ordinary operation of the railroad were necessary for the preservation of the road, and to the business of the road, were contracted with the expectation and intention of the parties that they were to be paid out of the current earnings of the road, and accrued within six months prior to the appointment of the receiver. In addition, there are unsecured and general creditors. This appeal involves the government's claim of priority over all creditors, secured and unsecured, by virtue of the provisions of section 3466, R. S. (31 USCA § 191), to wit:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

The claims of the United States, appellant, involved herein are four in number, and are thus described:

#### "Claim 2700.

"Item One.—This item consists of a loan in the principal amount of $1,382,000, from the Secretary of the Treasury to the Minneapolis & St. Louis Railroad Company under section 210, Transportation Act, 1920, as amended, and Certificate No. 81 of the Interstate Commerce Commission, evidenced by a promissory note executed by the Railroad Company on April 1, 1921, due April 1, 1931, with interest at 6 per cent. per annum, payable semiannually.

"Item Three.—This item consists of a principal sum of $625,000 indebtedness of the railroad to the United States, at the termination of Federal control, funded pursuant to the provisions of section 207, Transportation Act, 1920, 41. Stat. 462, evidenced by the Railroad Company's promissory note acquired by the Director General of Railroads, dated May 27, 1922, with interest at 6 per cent. per annum, payable semiannually.

"Item Four.—This item is also in the principal amount of $625,000 representing further indebtedness of the Railroad Company to the United States at the termination of Federal control, funded pursuant to the provisions of section 207, Transportation Act, 1920, and is evidenced by a promissory note executed by the Director General of Railroads, dated April 2, 1923, due on demand with interest at 6 per cent. per annum, payable semiannually.

#### "Claim 4186.

"This claim is in the sum of $292,022.23, together with interest thereon at 6 per cent. per annum from May 28, 1921, representing an overpayment of advances to the Railroad Company under the guaranty provisions of section 209, Transportation Act, 1920 (49 USCA § 77), that amount having been certified by the Interstate Commerce Commission on April 14, 1924, as paid in excess of the amount guaranteed."

The master found against the government as to the preferential status of all four claims. Upon exceptions, the court sustained the master. With respect to each of items 1, 3, and 4, of claim 2700, the following language was used:

"The whole of this amount is allowed as a general claim only, and is ordered to be paid pro rata with other claims of like general status from such funds, if any, in the hands of the court in this cause as may now or hereafter be available for that purpose, without any preference or priority either against the corpus of the mortgaged property or in relation to any other claim or class of claims duly filed in this cause."

Claim 4186 was, thus disposed of:

"The claim (Master's No. 4186) of the United States against the Minneapolis & St. Louis Railroad Company as set forth in the report of the special master, is hereby adjudged to have no preferential status, this being the only question relative to said claim submitted for determination."

In as much as these rulings finally dispose of the preferential status of these specific liquidated claims, presented for allowance and ultimate payment as such, this ap-

peal is not premature. An allowance or disallowance usually settles the status of a claim, even though, in any event, it may not be entitled to immediate payment. City & County of Denver v. Stenger (C. C. A. 8) 295 F. 809, 814.

Let us first consider the nature of these governmental claims and the terms of the statute under which the indebtedness accrued. Item 1 of claim 2700, as stated, consists of a loan made by the government to the railroad under the provisions of section 210 of the Transportation Act of 1920 as amended, 41 Stat. 946. Paragraph A of section 210 provides as follows:

"For the purpose of enabling carriers by railroad subject to the Interstate Commerce Act properly to serve the public during the transition period immediately following the termination of Federal control, any such carrier may, at any time after the passage of this Act and before the expiration of two years after the termination of Federal control, make application to the Commission for a loan from the United States, setting forth the amount of the loan and the term for which it is desired, the purpose of the loan and the uses to which it will be applied, the present and prospective ability of the applicant to repay the loan and meet the requirements of its obligations in that regard, the character and value of the security offered, and the extent to which the public convenience and necessity will be served. The application shall be accompanied by statements showing such facts and details as the Commission may require with respect to the physical situation, ownership, capitalization, indebtedness, contract obligations, operation, and earning power of the applicant, together with such other facts relating to the propriety and expediency of granting the loan applied for and the ability of the applicant to make good the obligation, as the Commission may deem pertinent to the inquiry." 41 Stat. 468.

Paragraph B provides that the Commission, after such hearing and investigation, "may certify to the Secretary of the Treasury its findings of fact and its recommendations as to: the amount of the loan which is to be made; the time, not exceeding five years from the making thereof, within which it is to be repaid; the character of the security which is to be offered therefor; and the terms and conditions of the loan."

By paragraph E, $300,000,000 is appropriated to be used as a revolving fund for the purpose of making the loans provided for in this section.

The master details the circumstances under which this claim arose. Six per cent. gold bonds of the Minneapolis & St. Louis Railroad Company, in the amount of $1,382,000, secured by mortgage known as the Pacific Extension Mortgage, matured April 1, 1921. To meet this the United States, under the provisions of section 210, advanced to the railroad $1,382,000, payable in ten years, and on the same date the railroad executed and delivered the promissory note which forms the basis of item one of claim 2700. At the same time $2,377,000 par value of the Minneapolis & St. Louis refunding and extension bonds were deposited as collateral for this loan.

Item 3 of claim 2700 is thus stated in the findings of the master:

"Item 3 (Government's Exhibit No. 1) of this claim is a promissory note for $625,000.00 given to the Director General of Railroads by the Minneapolis & St. Louis Railroad Company, dated May 27, 1922, due March 1, 1930, and with interest at the rate of 6% per annum, payable semiannually on the 1st days of April and October in each calendar year, until payment of said principal sum. This obligation represents indebtedness incurred in the operation of the Minneapolis & St. Louis Railroad Company to the United States of America due at the termination of Federal control and which was funded pursuant to the provisions of section 207 of the Transportation Act, 1920. This note was secured by a deposit of collateral of $1,500,000.00 principal amount of the Refunding and Extension Mortgage, 50 year, Series "A", 5% gold bonds of the Minneapolis & St. Louis Railroad Company, dated January 1, 1912, and due in 1962."

The finding with respect to item 4 is substantially identical as to origin and security. The date of the note given thereunder was April 1, 1923. These two items arose under the provisions of section 207 of the Transportation Act of 1920. Paragraph A of that section provides that:

"As soon as practicable after the termination of Federal control the President shall ascertain (1) the amount of the indebtedness of each carrier to the United States, which may exist at the termination of Federal control, incurred for additions and betterments made during Federal control and properly chargeable to capital account; (2) the amount of indebtedness of such carrier to the United States otherwise incurred; and (3) the amount of the indebtedness of the United States to such carrier arising out of Federal control," in order that certain rights

of set-off, together with other adjustments stated, may be made.

Paragraph B then provides further as follows:

"Any remaining indebtedness of the carrier to the United States in respect to such additions and betterments shall, at the request of the carrier, be funded for a period of ten years from the termination of Federal control, or a shorter period at the option of the carrier, with interest at the rate of 6 per centum per annum, payable semiannually, subject to the right of such carrier to pay, on any interest-payment day, the whole or any part of such indebtedness. Any carrier obtaining the funding of such indebtedness as aforesaid shall give in the discretion of the President, such security, in such form and upon such terms, as he may prescribe."

Claim No. 4186 arises under section 209 of the Transportation Act. By that section, for the period of six months after the termination of federal control, said six months beginning March 1, 1920, the United States guaranteed to the carriers in general that their railway operating income for such guaranteed period as a whole should not be less than one-half the average annual railway operating income of such carrier during a test period defined to mean the three years ending June 30, 1917. The terms of this guaranty varied with respect to the status of the carrier and the relationship existing between it and the government during the period of federal control. Paragraph G of this section provides:

"The Commission shall, as soon as practicable after the expiration of the guaranty period, ascertain and certify to the Secretary of the Treasury the several amounts necessary to make good the foregoing guaranty to each carrier. The Secretary of the Treasury is hereby authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States, for the amount shown in such certificate as necessary to make good such guaranty. An amount sufficient to pay such warrants is hereby appropriated out of any money in the Treasury not otherwise appropriated."

Paragraph H provides for advancements to the carrier from time to time upon application to the Interstate Commerce Commission of sums, not in excess of the estimated amount necessary to make good the guaranty, and necessary to enable it to meet its fixed charges and operating expenses; and, further, that upon final determination of the amount of the guaranty provided the carrier will repay to the United States any amounts which it may have received from such advancements in excess of the guaranty.

Claim No. 4186, as found by the master, is based upon an alleged indebtedness to the United States, as evidenced by a determination of the Interstate Commerce Commission, in the sum of $292,022.23. It is claimed that an aggregate amount of $2,150,000 was certified for payment as advances under paragraph H, and that $490,000 additional was certified as a partial payment under paragraph G. The total amount found by the Commission as necessary to make good the guaranty was $2,347,977.77. The difference between the advancements and this latter figure represents the overpayment by the government in connection with the adjustment of accounts with respect to this guaranty. The formula followed by the Commission in arriving at the amount of the guaranty is disputed by the railroad and its receiver, and therefore the court below passed only upon the preferential status of the claim, and not upon its amount.

To these claims of the United States, a twofold defense is presented for consideration: (a) That of the mortgagees, or lienors; and (b) that of the priority creditors, as hereinabove defined, who claim an equitable lien superior to all other demands represented. Of these in their order.

(a) The mortgage trustees, appellees herein, defend upon the ground that the priority claim of the government, even though applicable in any sense, is inferior to the mortgage lien of the bondholders. They take the position announced in United States v. Duncan, Fed. Cas. No. 15,003:

"It has been uniformly held in all the cases that the priority of the United States does not disturb any specific lien, nor the perfected lien of a judgment, that is does not supersede a mortgage on land, nor a judgment made perfect by the issue of an execution and a levy on land. Thelusson v. Smith, 2 Wheat. 396 [4 L. Ed. 271]; Conard v. Atlantic Ins. Co., 1 Pet. 386 [7 L. Ed. 189]."

To the same effect is United States v. Lewis, Fed. Cas. No. 15,595; United States v. Hooe, 3 Cranch, 78, 2 L. Ed. 370; Field v. United States, 9 Pet. 182, 200, 9 L. Ed. 94; Brent v. Bank of Washington, 10 Pet. 596, 9 L. Ed. 547, and 9 Op. of Atty. Gen. 28. The contention of the government is that the doctrine announced by the decisions just cited, upon which appellees rely, was dictum merely, and therefore not entitled to weight as a determination by the Supreme Court; further, that these earlier decisions

were based upon the status of a mortgage at that time as a conveyance and transfer of the title; whereas the modern view is that the title remains in the mortgagor—the mortgagee having but a lien. It is pointed out that those decisions were handed down during the period between 1805 and 1840; that as early as in 1863 the Supreme Court, in Hutchins v. King, 1 Wall. 53, 17 L. Ed. 544, called attention to the modification of the old rule respecting the effect of a mortgage of real estate, and that in Waterman v. Mackenzie, 138 U. S. 252, 11 S. Ct. 334, 34 L. Ed. 923, the court in 1891 announced the modern rule.

■ With respect to the first of these propositions, it may be said that while, strictly speaking, the rule announced by the Supreme Court in a number of these cases may be regarded as dictum, nevertheless the reannouncement of the doctrine repeatedly over a period of more than 100 years serves to establish it, not only as the consistent view of the court, but also as a rule of property upon which practical transactions have been, and are being, based. The attitude of the Supreme Court has not been changed since the advent of what appellant calls the "modern rule" concerning the effect of a mortgage of real estate. In 1897, in Savings & Loan Society v. Multnomah County, 169 U. S. 421, 428, 18 S. Ct. 392, 395 (42 L. Ed. 803), it said:

■ "This court has always held that a mortgage of real estate, made in good faith by a debtor to secure a private debt, is a conveyance of such an interest in the land, as will defeat the priority given to the United States by Act of Congress in the distribution of the debtor's estate."

The same principle is recognized in Marshall v. New York, 254 U. S. 380, 41 S. Ct. 143, 65 L. Ed. 315, decided in 1920, and also in Waterman v. Mackenzie, supra, cited by appellant as announcing the modern rule in 1891, to wit, "a mortgage is everywhere considered as passing the title in the land, so far as may be necessary for the protection of the mortgagee, and to give him the full benefit of his security." We deem it to be established beyond dispute that priority claims of the United States, under section 3466, R. S., are subordinate to the lien of a mortgage which has attached before the indebtedness to the government accrues.

(b) The questions involved in the defense made on behalf of the preferred creditors are serious ones. The priority conferred by section 3466 has been rigidly enforced in the decisions of the Supreme Court and other national courts. It is generally held that the statute is to be liberally construed in favor of the United States, and, together with section 3467 (31 USCA § 192), which designates the persons answerable for failure to observe the law requiring priority payment to the United States under prescribed circumstances, means "that a debt due the United States is required first to be satisfied when the possession and control of the estate of the insolvent is given to any person charged with the duty of applying it to the payment of the debts of the insolvent, as the rights and priorities of creditors may be made to appear." Bramwell v. U. S. Fidelity Co., 269 U. S. 483, 490, 46 S. Ct. 176, 178 (70 L. Ed. 368); Price, Receiver, v. United States, 269 U. S. 492, 46 S. Ct. 180, 70 L. Ed. 373; United States v. Butterworth-Judson Corp., 269 U. S. 504, 46 S. Ct. 179, 70 L. Ed. 380.

It is further held that, in taking over and operating the railroad systems of the country, the United States did so in its sovereign capacity as a war measure, and may not be held to have waived any sovereign right or privilege, unless plainly so provided. Dupont de Nemours & Co. v. Davis, 264 U. S. 456, 462, 44 S. Ct. 364, 68 L. Ed. 788. However, in Mellon v. Michigan Trust Co., 271 U. S. 236, 239, 46 S. Ct. 511, 512 (70 L. Ed. 924), it is said that, while "in taking over and operating the railroads, the United States acted in their sovereign capacity," nevertheless "all agree that the rights of the Director General rest upon statutory provisions, and not upon any sovereign prerogative of the United States." Therefore "it was for Congress to determine whether or not claims arising out of such operation should have priority when the debtor made a voluntary assignment. In cases of bankruptcy the statute then in force prohibited any preference."

■ The claims in Mellon v. Michigan Trust Co. arose out of operation under the Federal Control Act (40 Stat. 451, 456). The Director General presented claims for transportation charges and conversion of a shipment of pig iron, and asked priority of payment. It was held that he was not entitled to this under paragraph 3466 in view of paragraph 10 of the Control Act, which, so far as pertinent here, reads as follows:

"That carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common law, except insofar as may be inconsistent with the provisions of this Act or any other Act applicable to such Federal control or with any order of the President. Actions at law

or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government."

The court in its opinion said:

"In some matters, at least, under paragraph 10, the United States stand exactly as if they were a railroad corporation operating as a common carrier. Director General v. Kastenbaum, 263 U. S. 25, 28 [44 S. Ct. 52, 68 L. Ed. 146]. As said in Davis v. Pullen [C. C. A.] 277 F. 650, 655, 'there is a certain obvious injustice in giving the United States when engaged in an industrial and commercial venture, even although under war powers, superior rights over other creditors bearing like relations to insolvents.' And we think that the indicated purpose of Congress will be best carried out by construing the relevant statutes, so far as may be, with the general intent to preserve the substantive rights of all parties concerned as they would have existed but for federal control."

The decision in Mellon v. Michigan Trust Company affirms the judgment of the Circuit Court of Appeals of the Seventh Circuit in Davis v. Michigan Trust Co., 2 F.(2d) 194. The controversy arose in a general equity proceeding, where, as here, a receiver was appointed under circumstances sufficient to make such appointment an act of bankruptcy. Insolvency in the bankruptcy sense was not alleged, but, as here, insolvency in the sense of section 3466 was present. Neither was the jurisdiction of the bankruptcy court invoked, nor did it attach. In deciding that the Director General was not entitled to assert governmental priority over other creditors on claims arising out of governmental operation of railroads, the Circuit Court of Appeals used this language:

"Giving due regard to the expression of congressional policy of priority, on the one hand, and of a restriction to the rights that the carrier theretofore enjoyed, on the other hand, and on a careful balancing of conflicting interests, we believe that, especially in the light of the policy of the present Bankruptcy Act as interpreted by the Chief Justice, supra, priority must be denied to the Director General in this case."

Neither the Bankruptcy Act (11 USCA) nor paragraph 10 of the Federal Control Act in express terms excludes the application of section 3466 to the case under consideration.

The decision was reached by both courts through construction, which gave due regard to the indicated policy and purpose of Congress, as revealed in the Federal Control Act.

We feel that the Transportation Act continued in force to a large extent the relationships, responsibilities, and obligations created and imposed by the former act, and added others essential to the adjustments incidental to the termination of federal control. It was the announced policy of the United States, as revealed in this act, to see to it that the roads were sustained and that transportation was insured during the period following governmental operation, at which time serious disorganization existed, and the carriers were known to be in a very unstable financial condition. Much in the way of betterments had immediately to be provided. The morale was greatly impaired. Public confidence was in some measure diminished, and it was realized that the railroads could with difficulty, if at all, secure sufficient new capital to meet their necessities. These provisions of the Transportation Act were intended to supply such as could not be procured from private sources. We think there is great force in the contention that the government, by thus encouraging private capital to come to the support of the carriers, thrown upon their own resources, at the termination of an extended period of federal control, and at the close of an exhausting World War and by inviting credit to be given for current materials and supplies, presumably upon the same terms, security and protection afforded and long recognized with respect to railroad operations, has placed itself in a position where it is estopped to seek priority over those who have advanced money and furnished supplies under conditions which entitle them to a preferential status.

In a given case it is for Congress to determine whether section 3466 should apply. The Supreme Court, in Mellon v. Michigan Trust Co., held that, under the indicated purpose of Congress as expressed in paragraph 10 of the Federal Control Act, the United States was not entitled to the priority granted by section 3466. We think the same construction should be accorded to the Transportation Act. In our judgment, this language of the opinion in the Mellon Case "that the indicated purpose of Congress will be best carried out by construing the relevant statutes, so far as may be, with the general intent to preserve the substantive rights of all parties concerned as they would have existed but for Federal control," is equally appropriate here. We think, therefore, that

the rights of the priority creditors are superior to the claims of appellant. Those rights constitute equitable liens upon the estate to the extent of any net income of the receiver, and unmortgaged assets; and, in case of diversion of net operating income, during the six months period prior to receivership, to the payment of accruing interest on mortgage indebtedness or to capital account expenditure, those preferred rights may extend to the corpus itself. Brent v. Bank of Washington, 10 Pet. 596, 9 L. Ed. 547; Fosdick v. Schall, 99 U. S. 252, 25 L. Ed. 339; Burnham v. Bowen, 111 U. S. 776, 4 S. Ct. 675, 28 L. Ed. 596; Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 S. Ct. 415, 49 L. Ed. 717; Moore v. Donahoo (C. C. A. 9) 217 F. 177; Illinois Trust & Savings Bank v. Doud (C. C. A. 8) 105 F. 123, 52 L. R. A. 481; Chicago & Alton R. Co. v. U. S. & Mexican Trust Co. (C. C. A. 8) 225 F. 940. And these equitable liens may be enforced independently of foreclosure proceedings. Moore v. Donahoo, supra, 217 F. loc. cit. 183.

Holding, as they do, preferred rights, under certain conditions, over mortgages of record, it would seem illogical that they should be displaced by this governmental claim of priority, which, we think is clearly inferior to the mortgage liens. These equitable rights attached and were a subsisting charge upon the assets of the railroad before the United States, in any view, was in a position to assert and enforce its claim. Marshall, Receiver, v. People of the State of New York, 254 U. S. 380, 41 S. Ct. 143, 65 L. Ed. 315.

There are other reasons why appellant should not prevail in this action. The government, in making these loans and advancements, as a sequence to its operation of the roads during the war period, engaged in private business quite as substantially as it is held to have done under the Federal Control Act. Furthermore, the Transportation Act provided for the taking of security for loans made and for money advanced, and such security was taken in three of the four transactions under consideration. The act, therefore, is self-contained and sufficient unto itself without reliance upon section 3466, or any other statutory provision. The conditions surrounding these transactions differ in no substantial respect from those occurring in business between private parties, and should be governed by no other rules. United States v. Miller (C. C. A. 8) 28 F.(2d) 846, 850.

The decree below adjudged claim 4186 to have no preferential status, and that the three items of claim 2700 should be "without any preference or priority either against the corpus of the mortgaged property or in relation to any other claim or class of claims duly filed in this cause."

Inasmuch as only holders of liens legal and equitable are before us on this appeal, and since it is conceded that the estate will not realize more than enough to discharge the mortgage indebtedness and preferred claims, we find it unnecessary to consider the effect of the decretal order upon general creditors.

It follows from what has been said that the decree should be, and is, affirmed.