115 N.J. Super. 564 (1971)
280 A.2d 504
IN THE MATTER OF THE GENERAL ASSIGNMENT FOR THE BENEFIT OF CREDITORS OF HOLLY KNITWEAR, INC., A NEW JERSEY CORPORATION, ASSIGNOR,
v.
ROBERT S. SOLOMON, ASSIGNEE.
Superior Court of New Jersey, Essex County Court, Probate Division.
Decided July 27, 1971.
*567 Mr. Robert S. Solomon appeared for the assignee (Messrs. Kirsten, Solomon and Friedman, attorneys).
Mr. Arnold Samuels appeared for the claimant, Jonathan Logan (Messrs. Hein, Smith, Mooney & Berezin, attorneys).
Mr. Jerome S. Lieb appeared for the claimant Feldwin Realty Co. (Messrs. Lieb, Teich and Berein, attorneys).
Mr. Richard W. Hill, Assistant United States Attorney for the United States of America.
Mr. Philip Kagan appeared for claimant State of New Jersey.
Mr. Sidney Reitman appeared for wage claimants (Messrs. Kapelsohn, Lerner, Leuchter, Reitman and Masiel, attorneys).
Mr. David I. Fox appeared for claimant Northern Financial Corp. (Messrs. Fox and Fox, attorneys).
*568 Mr. Neil A. Kleinberg appeared for claimant Textile Financial Corp. (Messrs Kleinberg, Moroney, Masterson & Schachter, attorneys).
JOHNSON, J.C.C. (temporarily assigned).
On December 16, 1970 the assignor corporation Holly Knitwear, Inc., which was engaged in the manufacture of knitted fabrics, effected an assignment for the benefit of creditors. Shortly thereafter, on January 15, 1971, a public auction sale of the assets of the assignor corporation was held, which sale was confirmed by order of the County Court on February 8, 1971. The amount realized pursuant to said sale, $73,395, was inclusive of all machinery, equipment and inventory held by the assignor, with the sole exception of an automobile for which the additional value of $2400 was received.
This matter subsequently came before this court by means of a petition and order to show cause entered on behalf of the assignee for instructions with regard to a determination as to the priority of the various claims to the funds resulting from the sale of the assets of the said assignor. Involved herein, in addition to the assignee's request for administration expenses, are the following claimants:
1) United States of America: The Federal Government has claimed taxes due to the Internal Revenue Service in the amount of $40,601.34 for social security and withholding taxes and for federal unemployment insurance contributions. However, the proofs indicate that all of the claims arose subsequent to the filing of these proceedings, with the exception of claims for the tax quarter ending June 30, 1970 upon which an assessment was made on November 27, 1970 in the amount of $3,868.29.
2) Jonathan Logan Inc. (hereinafter Logan): Its claim, arising out of a purchase money security interest in two sewing machines for which financing statements were filed on June 10, 1970, is in the amount of $7500. In addition, attorneys' fees are sought.
*569 3) Northern Financial Corp. and/or Northern Commercial Corp. (hereinafter Northern): This claim of $8,939.32 is also predicated on a purchase money security interest which was appropriately filed with the Secretary of State of New Jersey on April 7, 1969. It, too, asks for reasonable attorneys' fees.
4) Textile Financial Corp. (hereinafter referred to as Textile): This party contends it has a valid and existing secured lien on assets in an amount equal to $23,870. This interest arose out of the security agreement entered into between Textile and the assignor to secure a loan to the assignor of $124,000. Said agreement was to serve as security for all future advances made by the creditor and was also intended to provide the creditor with a secured interest in all of the assignor's after-acquired property. Financing statements were filed October 3, 1967 and July 24, 1970. Attorneys' fees are also asked.
5) Feldwin Realty Co.: This party asserts a landlords' lien of $13,991.04 for rents due and for which it allegedly made a distraint on December 15, 1970.
6) State of New Jersey: The State claims priority for taxes due and owing the Business Personal Property Section in the amount of $4,652.04, in addition to some $1,339.80 due and owing the Division of Employment Security.
7) Employees of the assignor: These individuals seek sums totaling approximately $22,000 as wages to which they were entitled at the time of the assignment.

I
The initial question to be determined in this matter is whether, within the meaning of N.J.S.A. 2A:19-43, "all sums received by said assignee" constitutes value received for sale of collateral secured prior to the date of the assignment by purchase money security interests (as defined in N.J.S.A. 12A:9-107) and by general security liens, all of which were filed and perfected in accordance with N.J.S.A. 12A:9-101 et seq.
*570 Essentially, the secured parties in question contend that their respective liens should not be included in an accounting of the general assets of the assignor's estate and hence should not be charged with any part of the assignee's request for compensation or expenses incurred during the administration of said estate. The facts, which are virtually uncontroverted, reveal that the parties holding these security interests agreed to a sale of the collateral on which they held valid liens, solely on the understanding that if a profit resulted, such would redound to the benefit of the estate and that the secured parties would receive full satisfaction to the extent of their outstanding claims. A profit was realized and accordingly these parties in interest assert their reliance on this agreement in advancing their contentions.
As authority, Logan and Northern have cited cases wherein the courts dealt with questions of an assignees' status as a general lien creditor, as defined in N.J.S.A. 12A:9-301. However, these references are inapposite for our purposes here. Presently at bar is not the issue of whether the funds should revert to the general assets of the estate but whether the assignee should in fact be recompensed by the security creditors for his services and expenses. It should be recognized that the assignee is not attempting to assert his statutory role as lien creditor under N.J.S.A. 2A:19-14 and 12A:9-301(3) in an effort to wrest from lesser claimants assets which by right should belong to the general estate. Rather, such assets, as determined by the efficacy of the liens outstanding, have already been conceded to these creditors in terms of their priority. Thus, the assignee's only claim here is for his efforts, costs and expenses in distributing such assets. See In re Pynn-Hawley Co., 63 N.J. Super. 50 (Cty. Ct. 1960); In re General Assignment for Benefit of Creditors of Shay, 75 N.J. Super. 421 (App. Div. 1962); In re General Assignment for Benefit of Creditors of Xaviers, Inc., 66 N.J. Super 561 (App. Div. 1961).
New Jersey courts have long recognized and made mention of the fact that such receivers, trustees and assignees are *571 agents of the court and in this capacity should be considered as working for the benefit of all creditors who seek to reclaim from the insolvent's estate that which is their just due. Sullivan v. James Leo Co., 124 N.J. Eq. 317 (E. & A. 1938); Seidler v. Branford Restaurant Co., 97 N.J. Eq. 153 (E. & A. 1925); Lerman v. Lincoln Novelty Co., 130 N.J. Eq. 144 (Ch. 1941); Laudan v. ABC Travel System Inc., 64 N.J. Super. 204 (Ch. 1960).
It is true that the above-mentioned cases concern corporate receiverships wherein the court itself took control of the insolvent enterprise. However, it is now settled that the rationales behind the statutes dealing with corporate receiverships, N.J.S.A. 14A:14-1 et seq., and assignments for the benefit of creditors, N.J.S.A. 2A:19-1 et seq., are identical. Therefore, the receivership cases supply instructive precedent for the assignment proceeding before this court. In re General Assignment for Benefit of Creditors of Xaviers, Inc., supra.
Next, the creditors rely on the case of Sliker v. Fisher, 45 N.J. Eq. 132 (1889). Involved there were lands subject to mortgages which were conveyed to an assignee who, with the consent of the mortgagees, proceeded to sell such property free from any encumbrances. The proceeds realized from the sale were then used to pay off the mortgages, but since the proceeds were less than the appraised value of the lands, the assignee asked for an allowance out of the general assets of the estate to make up the difference still due. In denying this request the court held that the mortgagees' interests in the lands were not assigned and hence the assignee had no power over them. The court refused to allow the assignee to be recompensed at the expense of the general unsecured creditors. If he was entitled to any compensation, it would have had to come from the mortgagees themselves on whose behalf he had acted as agent.
It is argued by the creditors that this decision stands squarely for their central proposition, namely, that a valid security interest is superior and paramount to the rights an *572 assignee receives by virtue of a deed of assignment. However, an appreciation of the limited intendment of that decision, to protect the unsecured creditors, and a look at a more recent case wherein Sliker was interpreted in what must be from the creditors' viewpoint a much less fortuitous light, indicates clearly that their position is not the decided state of the law. In In re Pynn-Hawley Co., supra, the court stated that the statutory language "on all sums received" would lay to rest any further questions raised on account of Sliker. The text of that opinion seems to intimate that the assignee's commission could be predicated on any and all sums dealt with in the administration of the estate regardless of their source.
Moreover, a substantial line of cases has held that administration expenses must take priority over all other claims. These general expenses of receivership may be paid out of the funds in a receiver's hands before the payment of debts, whether the latter be secured or unsecured. Laudan v. ABC Travel System Inc., supra; Albert and Kernahan v. Franklin Arms, 107 N.J. Eq. 468 (E. & A. 1931); Pemberton Lumber and Millwork Industries v. William G. Ridgway Co., 38 N.J. Super. 383 (Ch. Div. 1955).
The Laudan case concerned an agreement between a travel agency and airlines, hotels and shipping lines, wherein it was provided that the agency would hold all funds collected by it for transportation costs in trust for the carrier. In the subsequent proceeding by the receiver of the insolvent agency for a pro rata apportionment of the administration expenses, the court dismissed the argument that trust funds involved did not constitute "assets" chargeable to any part of the receiver's compensation. The court stated succinctly that New Jersey courts have consistently afforded priority to the expenses of a receivership over a mortgage or other lien where it was equitable to do so; it perceived "No valid reason why the same principle should not apply to trust funds." At 207.
*573 This court is of the opinion that this policy is similarly dispositive of the present matter. Granted the lien holders here did not benefit financially by consenting to a sale of the collateral to which they retained a right of reclamation, but nowhere in this jurisdiction has it been held that monetary benefit to a lien holder by a receivership is the sine qua non for the priority of general administration expenses of the receivership. Seidler v. Branford Restaurant, supra; Bankers' Trust Co. v. Maxson, 100 N.J. Eq. 1 (Ch. 1926); Laudan v. ABC Travel System, supra.
What is crucial is that all parties involved have availed themselves of a process, the very existence of which is meant to benefit their own class of preferred creditors. In re Pynn-Hawley, supra, 63 N.J. Super. at 53, and In re Francilli Carriers, Inc. 77 N.J. Super. 522, 527 (Ch. Div. 1962). In light of the strong precedent amassed by this State's judiciary in efforts to effectuate that process, this court would be loathe to run afoul of that which has been so consistently reinforced over the years. As stated in Laudan, supra:
To hold otherwise would deprive the courts of the services in many cases of competent administrators and be subversive of the administration of this important branch of equity jurisdiction. [64 N.J. Super. at 207]
Accordingly, the creditors' motions to have the assignee relinquish their interests in toto, without deductions for administration expenses proportionate to the amounts claimed, are hereby denied.

II
The second issue to be considered is the claim for rent by the landlord Feldwin Realty Company. The landlord contends that the rent is owing for a six-month period which terminated on or about December 12, 1970. The rental amount involved therein was $1500 a month plus additional charges for rubbish removal, power, steam and hot water. The assignee, however, does question the validity of these *574 latter extra charges. The landlord also claims that a second lease was entered into with the assignor, which agreement become operative on September 1, 1970. This lease, covering additional loft premises, provided for rent to the landlord of another $500 plus costs. In total, the realty company is asserting a lien of some $13,991.04.
In accordance with N.J.S.A. 2A:44-166, the landlord is entitled to priority over all or any "title, lien, interest, mortgage, judgment, or other encumbrance created or acquired after machinery or other chattels are placed in the premises." Since Textile's interest in after-acquired property did not attach until these items were installed for use, it is clear that Feldwin's claim would be superior to that of Textile's for an amount equivalent to the sums of the total rents due for a period not exceeding six months. N.J.S.A. 2A:44-166. Equally certain is that the purchase money security interests held by Logan and Northern, respectively, are paramount to this claim advanced by the landlord since by their very nature those encumbrances were effectuated before the machines or chattels were placed in the premises.
Much has been made by both the assignee and the landlord of the validity of the distraint initiated just one day prior to the date of the assignment itself, viz: December 16, 1970. However, the court is of the opinion that the distraint proceedings, as prescribed in N.J.S.A. 2A:33-1 et seq., are irrelevant to the situation here where the landlord can rely on the strength of the Loft Act provisions, N.J.S.A. 2A:44-165 et seq., by which the efficacy of his lien is assured once rent payments fall due. Gibraltar Factors Corp. v. Slapo, 23 N.J. 459 (1957); also see 22 N.J. Pract. (Landlord & Tenant) § 1553. Hence, this decision obviates the assignee's argument that the distraint by the landlord on the goods of the assignor, if in fact valid, constituted a voidable preference pursuant to N.J.S.A. 2A:19-3. The operable date of a lien created under the authority of the Loft Act is the first date that the rent becomes overdue. As the facts here disclose, that date was well beyond the four-month *575 period preceding the date of the assignment for the benefit of creditors, within which time preferential transactions are deemed to transpire. N.J.S.A. 2A:19-3.
The landlord's lien will therefore be apportioned from that amount claimed by Textile pursuant to its general secured lien. Ultimate appropriation of that amount must, however, be deferred until the priority of the remaining claimants is determined.

III
Next to be determined are the relative priorities of the landlord's claim under N.J.S.A. 2A:44-166 and the claim of the Federal Government for taxes owing in the amount of $40,601.34.
The United States predicates its supremacy on the basis of 31 U.S.C.A. § 191. It should be noted that this statutory provision does not create a lien in favor of the government but rather establishes a general priority in insolvency proceedings in favor of the United States for debts owing the government. Beaston v. Farmers' Bank of Delaware, 12 Pet. 102, 37 U.S. 102, 9 L.Ed. 1017 (1838); H.B. Agsten & Sons, Inc. v. Huntington Trust and Savings Bank, 388 F.2d 156 (4 Cir.1967); United States v. Haddix & Sons, Inc., 252 F. Supp. 634 (E.D. Mich. 1966); Ideco Div. of Dresser Ind. v. Chance Drilling Co., 422 F.2d 165 (5 Cir.1970).
The question of whether a state-created lien has the necessary requisites to be exempt from the terms of 31 U.S.C.A. § 191 is a matter wholly within the aegis of federal law. United States v. Waddill, Holland & Flinn, Inc., 323 U.S. 353, 65 S.Ct. 304, 306, 89 L.Ed. 294 (1945).
It is now well settled that this governmental priority based on the above statute can only be defeated by "choate," perfected security interests in existence prior to the time of the obligees' indebtedness to the United States. United States v. Guaranty Trust, 33 F.2d 533, 537 (8 Cir.1929), *576 aff'd. 280 U.S. 478, 50 S.Ct. 212, 74 L.Ed. 556 (1930), and Exchange Bank and Trust Co. v. Tubbs Mfg., 246 F.2d 141, 143 (5 Cir.1957), cert. den. City of Dallas, Tex. v. Tubbs Mfg. Co., 355 U.S. 868, 78 S.Ct. 118, 2 L.Ed.2d 75 (1958).
Further elucidation of the general standards set forth in Guaranty Trust is provided in the cases of United States v. Bond, 279 F.2d 837 (4 Cir.1960), and Illinois ex rel. Gordon v. Campbell, 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348 (1946). In Bond the court stated that under the "choate lien" test it is required that state-created liens be specific to the point that nothing further need be done to make the lien enforceable. In Illinois ex rel. Gordon v. Campbell the court, by use of a tripartite formula calling for the identity of the subject asset, the lienor and the amount of the encumbrance, added a further embellishment to the general language employed in Guaranty Trust. See also United States v. City of New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954).
Thus, it is incumbent upon the landlord to prove to this court that his claim asserted under the provisions of the Loft Act constitutes a lien, which under federal law, will render such claim superior to that of the Federal Government.
Instructive on this point is the case of United States v. Saidman, 97 U.S. App. D.C. 344, 231 F.2d. 503 (1956). Involved therein was a priority claim by a landlord who relied on a District of Columbia statute which granted to lessors a tacit lien which could be enforced by attachment, judgment, or by an action against the purchaser of the encumbered assets. However, the landlord never made use of this remedial aspect of the statute and was thereby constrained to rely solely on the face of the statute to create a specific and perfected lien. The court denied his claim, holding that the statute did not intend to place absolute title or possession of the chattels with the landlord. Without subsequent enforcement of this statutory lien a "specific *577 and perfected lien in the sense long understood as essential to overturn the Federal priority" was not created. At 507.
Here the facts disclose that the landlord did avail himself of the distress proceedings provided by New Jersey statutory law, N.J.S.A. 2A:33-1 et seq., in an effort to enforce the lien authorized under N.J.S.A. 2A:44-166. Hence, at first impression, assuming arguendo that the distraint was proper, it would appear that in accord with Saidman the requisites of title and possession of the assets found on the premises of the debtor were retained by the landlord. Yet the terms of the distress statute do not so provide. N.J.S.A. 2A:33-9 grants the debtor tenant a grace period of ten days, within which time he can commence an action to regain the goods. Since the alleged distraint occurred on December 15, 1970 and the assignment took place the following day December 16, 1970, nine days remained before the lien reached full fruition. Thus, in no way can the landlord be considered to have had, at the date of the assignment for the benefit of creditors, a claim of the quality sufficient to defeat the federal priority.
The Supreme Court of the United States decided in this fashion in a case strikingly similar in its facts to the one at bar. U.S. v. Scovil, 348 U.S. 218, 75 S.Ct. 244, 99 L.Ed. 271 (1955), and our Appellate Division did likewise in an unpublished opinion. There being ample authority to support this result, the Federal Government's claim for taxes due shall be considered superior to the landlord's lien for rents owing. For similar reasons the claims of wage earners and the State of New Jersey shall also be subordinate to the rights of the Federal Government.
As regards the wage claims, the case of Robison-Anton Textile Co. v. Embroidery Prod. Corp., 97 N.J. Super. 507 (App. Div. 1967), is dispositive. The court decided there, as we must here, that the wage claims presented under N.J.S.A. 2A:19-30 and N.J.S.A. 34:11-31-33 were not perfected in the manner nor to the degree required *578 by federal law, as described above. There can be no question, therefore, that the federal claim warrants priority.
The same must hold for the State of New Jersey's claim of $5901.84 plus interest for business personal property taxes and for contributions owed the Division of Employment Security. These claims, priority of which are founded upon N.J.S.A. 54:49-1, were never reduced to possession by the State and are therefore ineffectual to offset the federal claim under 31 U.S.C.A. 191.

IV
Given the criteria (as set forth in Point III) by which a state-created lien preempts the federal priority arising out of 31 U.S.C.A. 191, the question of whether the legal fees sought by the secured parties meet that standard is easily resolved. It is manifestly clear that they do not. Unlike the purchase money and general secured interests to which the respective agreements providing for attorneys' fees attached, wherein the identity of the lienor, the subject property and the amount of the lien were all certain at the time the encumbrances arose (see United States v. City of New Britain, supra), the provisions pertaining to the attorneys' fees cannot be defined with definiteness. This is so because the specific ultimate amounts of these claims were dependent upon future events which, at the time of the inception of these claims, were not entirely foreseeable. See United States v. Pioneer American Ins. Co., 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963). In fact, according to the terms of the agreement the amount representing each claim could not be computed until, at the very earliest, the date of the assignment, when the final value of the liens could be ascertained. Moreover the sums certain for these claims might well have been formulated on the basis of the proofs submitted in the affidavits of services.
This court therefore holds that for present purposes the claims for reasonable attorneys' fees be considered distinct *579 and apart from the security agreements from which they arose, and in such posture they must be treated as inferior to the federal tax claim under 31 U.S.C.A. 191.

V
In dealing with the remaining group of claimants, i.e., the wage earners, the landlord and the State of New Jersey, the intent of the New Jersey Legislature is determinative. Accordingly, the wage claims presented herein must prevail. As provided in the Assignment Act, N.J.S.A. 2A:19-30, wage claims "shall be preferred and shall be paid by the assignee before any other claim or debt," and pursuant to N.J.S.A. 34:11-33 wages of employees who have bestowed labor or services upon the personal property of a manufacturer shall be paid after sale of such property "to such employees in preference to any other creditors and without delay." See also N.J.S.A. 14A:14-21(3).
Subsequent interpretation of these provisions has left little doubt of the favored nature of wage claims. In Long v. Republic Varnish Enamel & Lacquer Co., 115 N.J. Eq. 212 (E. & A. 1933), involving the payment of wages during the statutory preference period in accordance with § 83 of the General Corporation Act, the court stated:
It has long been regarded as a proper function of the state to foster the welfare and safeguard the interests of wage-earners. Economic and other considerations underlay this long-established state policy. The amelioration of the condition of labor is recognized by enlightened government as a duty of paramount importance. And this solicitude for the wage-earners is not alone for the members of the favored class, but for the common good. It is conducive, if not, indeed, essential to the well-being of society that the economic security and contentment of the class that contributes so largely to the furnishing of its material needs be effected and sedulously maintained. An enactment such as this should be construed in the light of this sound and firmly established policy. [at 215, 216]
See also Robison-Anton Textile Co. v. Embroidery Prod. Corp., supra.
*580 This philosophy has been the consistent justification for the establishment of the primacy of wage claims vis a vis, landlords' liens. This policy was reiterated in Appel v. Republic Footwear, Inc., 70 N.J. Super. 335 (Ch. Div. 1961), even though there the landlord who had distrained for rent under N.J.S.A. 2A:33-1 et seq. was first in point of time to the wage claimant's lien under N.J.S.A. 14:14-21. However, the court ruled as it did, because the language of the statute, to the effect that wage claimants are prior to "all other liens that can or may be acquired," had long been considered as entitling those claims to priority over the landlord. At 339. See also Whitehead v. Whitehead Pottery Co., 115 N.J. Eq. 257 (Ch. 1937), and Philadelphia Dairy Prod. Co. Inc. v. Summit Sweets Shoppe Inc., 113 N.J. Eq. 458 (Ch. 1933).
Furthermore, the Loft Act, N.J.S.A. 2A:44-165 et seq., does not affect the priority of the wage claims. Although there is no holding addressed specifically to this point, the courts have ruled that an analogous statute, N.J.S.A. 2A:44-66, creating a mechanics lien and embodied within the same chapter of Title 2A as the Loft Act, does not upset the wage earner's preferred status. Thus, the landlord's lien involved herein should be viewed in pari materia with the mechanics's lien, to the end that the primacy of the wage claims should still be recognized. J.W. Pierson Co. v. West Orange-Verona Bldg. Co., 112 N.J. Eq. 426, 428 (Ch. 1933).
Added indicia of the Legislature's intent is evidenced within the context of the Assignment Act itself, N.J.S.A. 2A:19-1 et seq. Therein the Legislature has immediately preceded the section dealing with the landlord's lien, N.J.S.A. 2A:19-31, by that part pertinent to wage claims, N.J.S.A. 2A:19-30. Although not creating a lien, the Assignment Act does provide wage claimants with a "preferred" status payable "before any other claims or debts." Certainly meant to be included in that category must be considered *581 those claims or debts provided for in the immediately succeeding section of the act.
This same legislative intendment guarantees the wage-earner's priority over the State's claim for business personal property taxes under N.J.S.A. 54:11A-1 et seq. and N.J.S.A. 54:49-1. One such enactment reflecting this purpose is N.J.S.A. 54:4-106 which, while providing for the payment of municipal personal property taxes out of the first moneys received by an assignee or a receiver, explicitly declares wage liens unaffected by the terms of that section. See Spark v. La Reine Hotel Corp., 112 N.J. Eq. 398 (Ch. 1933).
Although the tax in question here was levied on behalf of the State rather than by one of its political subdivisions, there is ample authority to the effect that both municipal and state tax claims are subordinate to liens of wage earners. Decorative Utilities Corp. v. National Motors Trucking Corp., 123 N.J. Eq. 48 (Ch. 1938), and Lerman v. Lincoln Novelty Co., 130 N.J. Eq. 144 (Ch. 1941).
Still remaining, however, is the vexing problem of whether the varying amounts identified by the wage claimants as payments by the employer for vacation pay constitute "wages fully earned, though not yet payable," within the purview of the Assignment Act, N.J.S.A. 2A:19-30. The wage claimants argue that moneys going into the special welfare benefit fund are tantamount to deferred payments earned by the employees in consideration for services rendered. Hence they contend that these amounts can in no way be considered gratuities, gifts, or even pension funds founded on policies of good will rather than on direct labor costs.
There is no doubt that if the wage claimants are correct and the vacation pay, provided for by the collective bargaining agreement of July 16, 1970 entered into between the assignor corporation and Local 222 of the ILGWU is, in fact, due and owing each employee for services rendered, such funds must be considered as "wages within the contemplation of the Assignment Act. In re Wil-Low Caf., 111 F.2d 429, 432 (2 Cir.1940); Textile Workers Union of *582 America v. Paris Fabric Mills, 22 N.J. Super. 381, 384 (App. Div. 1952); Botany Mills, Inc. v. Textile Workers Union, 50 N.J. Super. 18, 30 (App. Div. 1958); In re General Assignment for Benefit of Creditors of National Meat Supply Co., 66 N.J. Super. 423 (Cty. Ct. 1961).
Nevertheless, neither the express terms of the relied upon collective bargaining agreement nor judicial precedent pertaining to similar provisions in other collective bargaining agreements, United States v. Embassy Rest. Inc., 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959); Joint Industry Board of Election Ind. v. United States, 391 U.S. 224, 88 S.Ct. 1491, 20 L.Ed.2d 546 (1968); In re General Assignment for Benefit of Creditors of National Meat Supply Co. supra, support the wage claimant's view.
The agreement, effective as of July 16, 1970, served to renew the contract (hereafter referred to as the main agreement) which had expired on July 15, 1970. According to the terms of the main agreement, the employer is to pay weekly to the union a sum equivalent to 3-1/2% (subject to subsequent increases) of the total gross weekly payroll of all the nonsupervisory production, maintenance, packing and shipping workers employed in its shops. 2% of these payments are to be allocated towards the Health and Welfare Fund, a "trust fund" maintained by the union for the purpose of providing workers with health, welfare and recreation benefits. However, in Section (A) subsection (a)(1) the agreement expressly states "that none of the payments made hereunder by the employer shall constitute or be deemed wages due to the workers." In addition, the health and welfare fund, as described in section (A), subsection (b) of the main agreement is not meant to extend to an individual worker any legal or equitable right, title or interest in, or claim against his or any other employers' payments toward the fund or against the fund itself. Thus, solely the union organization, as contrasted to an individual employee in his capacity as a wage earner, can lay claim to the monies apportioned to the fund. There is absolutely no provision in the *583 contract allowing a worker on his own initiative to secure such amount due him as a consideration for his labors. Enforcement of the trust provision is the exclusive province of either the board of trustees of the fund or of the union organization.
In a federal bankruptcy proceeding the United States Supreme Court had occasion to rule upon the terms of a similar collective bargaining agreement which provided for a union welfare fund. The decision there was that the contributions of the employer were not entitled to priority as "wages due the workmen" under the Bankruptcy Act. United States v. Embassy Rest. Inc., supra. In examining the nature of the employers' payments to the fund the court took special note of the following:
They are flat sums of $8 per month for each workman. The amount is without relation to his hours, wages or productivity. It is due the trustees, not the workman, and the latter has no legal interest in it whatsoever. A workman cannot even compel payment by a defaulting employer * * *. Finally, Embassy's obligation is to contribute sums to the trustees, not to its workmen: it is enforceable only by the trustees who enjoy not only sole title, but the exclusive management of the funds. [359 U.S. at 32, 79 S.Ct. at 556]
The mechanics and incidents of that fund being virtually identical to the correlative aspects of the subject fund, I am constrained to reach the same conclusion. Moreover, in the instant case the employees' representatives have all but contracted away the legal contentions proffered by the wage claimants. In contrast to other collective bargain agreement situations, In re General Assignment for Benefit of Creditors of National Meat Supply Co., supra, the employer's payments here were not characterized as "wages." To the contrary, the agreement specifically stated, as described above, that these payments were not to be construed as wages. This fact alone more than reinforces the court's decision; it requires it.
Accordingly, it is the opinion of this court that the amounts owing the employees out of the health and welfare *584 fund be deemed not to constitute "wages" within the intendment of N.J.S.A. 2A:19-30.

CONCLUSION
It follows from that which has been decided above that the purchase money security interests of Logan and Northern should be satisfied first. Next in terms of priority is Textile which shall recover that amount of its claim outstanding, less that portion of its lien to which the landlord has laid greater claim (see Point 2). This amount will be included in the total apportioned to the general creditors. Among this latter group the Federal Government's claim will take precedence (see Point 3) and the small balance then remaining shall be allocated first to a satisfaction of the attorneys' fees and then towards partial payment of the wage claims.
The court has considered the requests for counsel fees by the attorneys for Logan, Northern and Textile and finds that said requests are reasonable. The fees sought by Messrs. Hein, Smith, Mooney and Berezin ($1750), Messrs. Fox and Fox ($1340.90), and Messrs Kleinberg, Maroney, Masterson and Schachter ($3580.50) are hereby allowed and are to be paid by the assignee upon final accounting.
Since the claims of Logan and Northern have been paid by the Assignee pursuant to an order of this court dated June 25, 1971, an order may be submitted to remit their respective proportionate shares of the assignees' commissions and expenses. In re General Assignment for Benefit of Creditors of Xaviers, Inc., supra.